**FLEMING et al. v. MOBERLY MILK PRODUCTS CO.**

No. 9475.

United States Court of Appeals
District of Columbia.

Argued Feb. 7, 1947.

Decided Feb. 14, 1947.

Writ of Certiorari Dismissed May 5, 1947.
See 67 S.Ct. 1304.

EDGERTON, Associate Justice, dissenting.

Mr. Carl A. Auerbach, of Washington, D. C., Gen. Counsel, OPA branch, Office of Temporary Controls, with whom Messrs. William R. Ming, Jr., and Albert M. Dreyer, both of Washington, D. C., OPA branch, Office of Temporary Controls, were on the brief, for appellant Fleming.

Mr. George Morris Fay, U. S. Atty., of Washington, D. C., was on the brief for appellant Anderson.

Mr. Richard E. Guggenheim, of Washington, D. C., Atty., Department of Justice, also entered an appearance for appellant Anderson.

Mr. Raymond R. Dickey, of Washington, D. C., with whom Messrs. Joseph B. Danzansky, Bernard Margolius, Edward L. Koepenick, and Carleton U. Edwards II, all of Washington, D. C., were on the brief, for appellee.

Messrs. Charles M. Fistere and Leo N. McGuire, both of Washington, D. C., on behalf of the American Bulk Condensed Milk Association, filed a brief as amicus curiae, urging reversal.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Appellee company brought a civil action in the District Court to enjoin appellants, the Administrator of the Office of Temporary Controls, successor in authority to the Office of Price Administration, and the Secretary of Agriculture, from enforcing certain provisions of an order [1] relating to allotments of sugar, in so far as those provisions made quotas dependent upon the historical practices of milk processors, or contained restrictions which would prevent any small plant capable and desirous of participating in the expansion, resumption, or initiation of production for nonwar use, from participating in such production. Trial was had, and the District Court made findings of fact, reached conclusions of law, and rendered judgment for the plaintiff-appellee. The defendant officials appealed.

Appellee company is a producer of sweetened milk in bulk for bakeries, ice cream makers, and similar enterprises. It began business in May, 1946. Its principal materials are sugar and skimmed milk. From September, 1942, until November, 1946, allocations of sugar were made by the Administrator to manufacturers in this industry on a "provisional allowance basis."[2]

---

[1] Amendment 24 to Third Revised Ration Order No. 3, issued October 8, 1946. 11 F.R. 11699.

[2] Section 19.8 of Third Revised Ration Order No. 3. 11 F.R. 134.

This was an allotment proportioned upon the estimated needs of the various users, as indicated by the amount of unrationed raw commodity (milk) available to each. As of November 1, 1946, the Administrator changed to the "historical-use basis" of allocation for this industry.[3] Under it a user is allocated sugar on the basis of a percentage of the quantity of sugar actually used by him in some past period.[4] Concerns which used sugar before January 1, 1945, were allotted a proportion of a "base," which was computed from their actual use of sugar in 1943, 1944 and 1945.

Because appellee company did not use sugar prior to October, 1945, its allotment beginning November 1, 1946, was determined by the provision of the amended Order applicable to such users. Its allotment was computed by the Administrator under the amended Order in five steps: (1) The amount of sugar used by the company in May, June, July and August, 1946, was stated.[5] This totaled 127,710 pounds. (2) The percentage which the average May-August production of the industry bore to the average annual production of the industry, was computed. This was 48½ per cent. (3) By the use of this percentage figure, the amount of sugar actually used by appellee in May-August, 1946, was blown up into a theoretical or "projected" yearly total. This was 263,320 pounds. (127,710 pounds is 48½ per cent of 263,320 pounds.) (4) This "projected" yearly total was spread over the calendar months according to the average monthly production percentages of the industry. Thus, on the average, the industry production for September was 6½ per cent of the average annual production. So September was allotted 6½ per cent of the amount allotted for the year. Appellee company's September allowance,

subject to Step 5, was computed at 6½ per cent of 263,320 pounds, its projected annual total. (5) Each monthly allotment shown by the foregoing was cut 50 per cent. This was because the amount of sugar used by the industry in 1946 was twice the average amount used in the base period 1943-1945. The reduction was to put 1946 users on a comparable basis with 1943-1945 users.

Two simple facts seem indisputable. First: The company's production of sweetened milk depends upon sugar. The Administrator controls sugar, and thus directly controls the company's production of sweetened milk. Second: The company's allotment of sugar under the amended Order is computed from and upon its actual use of sugar in May-August, 1946. If it had been in existence and had used sugar in 1943-1945, it would come under a different rule in the amended Order, and its allotment for all future time so long as the Order remained in effect, would have been different, depending upon its actual use of sugar in those years. If, perchance, it had used more sugar in May-August, 1946, than it actually did use, its future annual and monthly allotments would have been correspondingly more; and if it had used less, its allotments would have been less.[6]

The company says that by the amended Order the Administrator has made its production of sweetened milk dependent upon its existence in May-August, 1946, and upon its operations in that period. Factually, there is no possible denial of that conclusion. The company says that, therefore, the amended Order is in direct violation of the provision of the War Mobilization and Reconversion Act [7] which says: "Such [expanded, resumed, or initiated] production for nonwar use * * * shall not be made dependent upon the existence

---

[3] Amendment 24 to Third Revised Ration Order No. 3 was effective October 14, 1946, but as of November 1, 1946.

[4] This description of the historical-use basis is taken from appellants' brief. The description of the allotment to appellee is also from appellants' brief.

[5] Although the Amendment was effective as of November 1, 1946, it prescribed a "base" fixed by actual monthly use through August 31, 1946.

[6] This is made doubly clear by the fact, recited in the Administrator's brief, that

by an "adjustment" and apart from this proceeding, the company's annual allotment was increased 48,354 pounds by eliminating from the computation the amount of sugar used in May. The "adjustment" was made because the company used sugar only three days in May and it was not deemed fair to treat three days' use as a whole month's use.

[7] 58 Stat. 787, 50 U.S.C.A.Appendix, §§ 1658, 1659, 1660.

of a concern or the functioning of a concern in a given field of activity at a given time; * * * "[8]

Certainly the initial impression upon reading the statute in the light of the facts is that the District Court was correct in its view. The production of bulk sweetened milk, a nonwar use of sugar, had expanded from 82,467 tons in 1943 to 198,463 tons in 1946. The production of this company had been "initiated" in 1946. So its production was an initiated one, part of an expanded one. The amended Order made that production dependent upon the existence of the company prior to August 31, 1946. Moreover, the non-existence of the company prior to December 31, 1945, and thus its existence *only* in the period May-August, 1946, was a determining factor in the computation of its permitted production. The extent of its operations, which would seem to be its "functioning" between specified dates which would seem to be "a given time", in the production of sweetened milk, which would seem to be "a given field of activity", determined its allotment of sugar. The allotment of sugar fixed its production. This is what seems to be "a clear-eyed reading of the statute".[9]

The company also says that the amended Order violates that section of the statute which provides:[10]

"(a) Whenever the expansion, resumption, or initiation of production for nonwar use is authorized, on a restricted basis, by any executive agency having control over manpower, production, or materials, the restrictions imposed shall not be such as to prevent any small plant capable and desirous of participating in such expansion, resumption, or initiation of production for nonwar use from so participating in such production.

"(b) Whenever such executive agency allocates available materials for the production of any item or group of items for nonwar use, it shall make available a percentage of such materials for the exclusive use by small plants for the production of such item or group of items. Such percentage shall be determined by the head of such agency after giving full consideration to the claims presented by the chairman of the board of directors of the Smaller War Plants Corporation and shall be fair and equitable."

This latter contention of the company is based upon three features of the amendment. (1) The use of a base which terminates August 31, 1946, and which thus automatically excludes new users who after that date desire to participate in production. (2) The specific provision of the amended Order which excludes new users. That provision reads, "Any person who did not use sugar for such purpose at any time from January 1, 1943 through August 31, 1946 is not eligible to register."[11] A user must register in order to secure any allotment. (3) No percentage of the available sugar is made available for the exclusive use of small plants.

Appellants do not contradict the factual premises of the company's position, but rather seek to avoid the conclusion by several contentions. (1) They deny the jurisdiction of the District Court. (2) They say that the quoted provisions of the Act have not come into effect and will not become operative until the total amount of sugar available for nonwar industrial use has increased over the amount available for that use in 1944, when the Act was passed. They base this contention upon the statutory provision as to expansion of production for nonwar use. (3) They say that the "existence" of a concern, within the meaning of the statute, is its bare existence in the form in which it presently does business; for example, corporate form. And they say that "functioning" means the bare fact of operation and has no quantitative meaning; i. e., it does not refer to the amount, method or other features of operation apart from the simple fact of functioning. (4) They admit that the Amendment would be invalid in its exclusion of new users and its failure to make special provision for small plants, if the Act were now operative. In reply

---

[8] Sec. 203 (b) of the Act.

[9] An expression of Mr. Justice Frankfurter in Federal Communications Commission v. Columbia Broadcasting System, 311 U.S. 132, 61 S.Ct. 152, 154, 85 L.Ed. 87.

[10] Sec. 204 of the Act.

[11] Sec. 24.1 (a) of Amendment 24.

264

to that contention of the company, they rely upon their argument that the Act has not yet become operative.

We meet first the question of jurisdiction. The Act provides no statutory procedure for judicial review of an Order such as Amendment 24. The question is the availability of judicial examination in the absence of specific statutory provision for it.

█ The first part of the inquiry must be whether this appellee alleges, and establishes, that it has a direct interest sufficiently substantial to enable it to complain. It is alleged, and the trial court found, that the action of the Administrator reduced the company's immediately preceding allotment by more than 90 per cent, causing it to dump into the sewer between 250,000 and 300,000 pounds of skimmed milk and to lose approximately $120 a day since November 1, 1946, and has caused and will cause the company irreparable injury and damage. It is clear that a continued suspension of the company's business will destroy a most valuable asset in its established relationship with its suppliers of milk. These facts are not disputed upon this appeal and are sufficient to establish the right of appellee to complain, if any right of resort to the courts exists.

The next inquiry is whether there is judicial power to consider the challenge made by the company. The challenge is that the Administrator has violated a specific prohibition of the statute. It is that he has done what Congress specifically told him not to do. The question thus posed must be delimited to its actualities. It is not vague or broad or general. It is succinct, narrow and specific.

█ Our answer is that when a person affected concretely, substantially and irreparably by administrative action, complains that the action is in direct violation of a statutory prohibition, the courts have power to entertain the complaint, and if it is proved to be well founded in fact and in law, to enjoin the action. The answer flows immediately from the ultimate fundamentals of the Constitution. The legislative power is in the Congress. It can permit and it can delineate its permission with a correlative prohibition. The Executive cannot make law, except in so far as the Congress authorizes him to implement legislation within the bounds of prescribed standards. When the Congress specifically prohibits the Executive from a particular act within the conceivable scope of a general legislative enactment, he has no power to do that act. It is an inherent power of the federal judiciary to enjoin such an act. That there be such power was one of the prime compelling reasons for the creation of the judicial branch as an independent and equal branch of the Government.

█ The Administrator says that the fact that Congress provided in the 1944 extension of the Second War Powers Act[12] that the courts might review "suspension orders" but was silent as to a review of any other form of priority and allocation order, shows that Congress did not intend that the courts review action such as that involved in the case at bar. The doctrine relied upon is the familiar expressio unius est exclusio alterius. But the argument ignores the outstanding characteristic of the question before us. The question here is whether the administrative act was in direct violation of a specific prohibition. If Congress had merely omitted mention of orders other than suspension orders, and done nothing more, the Administrator's argument would have substance. But Congress wrote into the statute a specific prohibition against a described course of action. Judicial review of an act alleged to be in violation of that prohibition does not depend upon a failure of the Congress to prescribe such power, but upon the inherent power of the courts to restrain executive action in direct violation of a specific direction of the Congress. Whether judicial power exists to review an administrative action which lies within the framework of a broad legislative grant of power, is not the question before us.

The Administrator says that "Congress was satisfied that ample safeguards against arbitrary exercise of the allocation powers would be afforded by procedures within the administrative agencies themselves and by the general supervision over administrative action exercised by the President

[12] Act of December 20, 1944, 58 Stat. 827, 50 U.S.C.A.Appendix, § 633.

and the Congress." That may or may not be so as to allocation orders within the broad standards of the statutory permission, but it does not meet the question here. If applied to a specific Congressional prohibition, that doctrine would spell executive absolutism, a concept unknown to our law. By its prohibitory enactment, Congress has exercised its power of restraint, except such penal measures of impeachment or for contempt as it might apply. If the judiciary has no power in such matter, the only practical restraint would be the self-restraint of the executive branch. Such a result is foreign to our concept of the division of the powers of government.

█ We need not review the authorities at length. We think they are ample.[13]

█ We come next to appellants' contention that the statute is not yet operative. The answer depends upon the meaning of the statute. We must look both to its purpose and to its language.

█ This is a Reconversion Act. It looks to the future, not to the past. Its prime consideration was an orderly "reestablishment of a healthy and expanding peacetime economy." [14] Congress was particularly concerned with small businesses and with returning veterans. Its objective was not the perpetuation of prewar status. Its concern was not that those in business in

some prior period be vouchsafed their previous relative standings by freezing to their account the proportions of materials shown by their prior uses. On the contrary, the purpose would appear to have been that those who are now ready and willing to produce should be permitted to do so, proportionately to the supply of materials. That such persons were not in prewar production is immaterial to that purpose. That somebody else who was in prewar business does not now care to participate would also seem to be immaterial. To allocate available materials to the latter and deny them to the former would seem to be the direct antithesis of the program. That is true whether the materials be scarce or in' plenty. The criterion for allocation of available materials in a reconversion program would seem, as a matter of legislative intent, to be readiness, ability, and willingness to produce, at the present time and in the future.

The economic conflict reflected by the difference between the historical-use basis and the provisional-allowance basis is between those concerns which had a prior establishment and those which in the postwar era are anxious to enter production. It is between status quo and an expanding economy. We do not find in the Congressional history of this statute any signs of a Congressional intent to constrain

---

13 They begin with Chief Justice Marshall's discussion in Marbury v. Madison, 1803, 1 Cranch 137, 162, 163, 2 L.Ed. 60, 68, 69, the immediate excitement about which centered about the judiciary-executive relationship rather than the judiciary-legislative relationship. 1 Warren, The Supreme Court in United States History (1923) 231 et seq. They continue down to the present. "An agency may not finally decide the limits of its statutory power. That is a judicial function." Social Security Board v. Nierotko, 1946, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. ——, 162 A.L.R. 1445. "Of course the Tax Court cannot define the limits of its own authority." McDonald v. Commissioner, 1944, 323 U.S. 57, 64, 65 S.Ct. 96, 99, 89 L.Ed. 68, 155 A.L.R. 119. "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." American School of Magnetic Healing v. McAnnulty, 1902, 187

U.S. 94, 110, 23 S.Ct. 33, 39, 47 L.Ed. 90, 96. Whether the agency acts within the authority conferred or goes beyond it, whether there is compliance with the legal requirements which fix the province of the agency, are appropriate questions for judicial decision. Federal Radio Commission v. Nelson Bros. Co., 1933, 289 U.S. 266, 276, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406, quoted in Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 144, 60 S.Ct. 437, 84 L.Ed. 656. See full discussion and cases cited in Estep v. United States, 1946, 327 U.S. 114, 66 S. Ct. 423, 90 L.Ed. 567, also in Addison v. Holly Hill Fruit Products, 1944, 322 U. S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488, 153 A.L.R. 1007; Yonkers v. United States, 1944, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed. 400; Switchmen's Union v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61.

14 H.R.Rep.No.1798, 78th Cong., 2d Sess. (1944) 6.

the future to a mold fashioned from past existence or performance. In speaking of principles to be legislatively enunciated regarding the reconversion of small business, Maury Maverick, the then Vice Chairman of the Smaller War Plants Corporation, said to the Special House Committee on Post-War Economic Policy and Planning on June 13, 1944:

"Allotments of material for civilian production to small producers must be made large enough to ensure possible operations. A uniform quota using some arbitrary percentage of pre-war production, can never be adequate or fair. There is no point in permitting a man to open his business and operate it a short period if bankruptcy is to be his reward.

"Quotas should not be based on percentages of pre-war business. Such quotas— known as grandfather clauses—are a first step toward forming American business into cartels and monopolies. All cartels seek to maintain their preferred position by use of quotas. Let us fight vigorously against any procedure which tends to encourage cartels and stifle free enterprise in America. Furthermore, such quotas eliminate new business and new business is an integral part of American economy and must be protected." [15]

The report of the Committee on Ways and Means,[16] which reported out its final version of the War Mobilization and Reconversion Act in the House, stated that it had relied upon the recommendations of the Special Committee,[17] which were the culmination of the hearings just referred culmination of the hearings just referred to.

Thus the broad purposes of the Act appear to us. They are not decisive, but they shed light upon controverted passages.

We now examine the statutory language. We have already noted its apparent meaning, but appellants urge a different construction.

The sentence directly pertinent is part of a paragraph which is a subsection under a declaration of policy. The whole of the relevant part is: [18]

"Curtailments of war production or terminations of war contracts shall be integrated and synchronized with the expansion, resumption, or initiation of production for other war purposes, and, to the greatest extent compatible with the effective prosecution of the war, of production for non-war use. To effectuate this policy—

\* \* \* \* \* \*

"(b) The executive agencies exercising control over manpower, production, or materials shall permit the expansion, resumption, or initiation of production for non-war use whenever such production does not require materials, components, facilities, or labor needed for war purposes, or will not otherwise adversely affect or interfere with the production for war purposes. Such production for nonwar use shall be permitted regardless of whether one or more competitors normally engaged in the same type of production are still engaged in the performance under any contract which is needed for the prosecution of the war, and shall not be made dependent upon the existence of a concern or the functioning of a concern in a given field of activity at a given time;"

█ Obviously, "production" does not mean the production of sugar itself, as there was no government control over such production. The statute refers to control over "production, or materials". "Production" must refer to the manufacture of commodities from sugar, or the processing of the raw material into some other commercial form. This conclusion is made doubly certain by reference to Section 204 of the Act, which speaks of "plants" engaged in "production", and of "materials for the production".

Appellants say that the quoted provisions mean that the Act does not become operative until there has been an "expansion,

15 Hearings Before the House Special Committee on Post-War Economic Policy and Planning, Part 3, 78th Cong., 2d Sess. (1944) 542.

16 H.R.Rep.No.1798, 78th Cong., 2d Sess. (1944).

17 H.R.Rep.No.1759, 78th Cong., 2d Sess. (1944).

18 Sec. 203 of the Act, 58 Stat. 787, 50 U.S.C.A.Appendix, § 1658.

resumption, or initiation of production for nonwar use". They further say that "expansion, resumption, or initiation of production for nonwar use" means the total production from a given material, in this case sugar, for all nonwar uses. In other words, they say that there can be no expansion, etc., within the meaning of the statute, until there is an increase in the total amount of sugar available for all nonwar uses. Appellee, on the other hand, says that "expansion, resumption," etc., refers to the expansion, etc., of any given production for nonwar use, in this case the production of bulk sweetened milk, or to the production of a given concern.

We fully appreciate the able argument of appellants' counsel addressed to the opening sentences of the quoted provisions, and to the general considerations of policy which would indicate what expansion, resumption, or initiation of production for nonwar use might properly mean in such provisions. But when it is attempted to carry into the statute itself the meaning appellants would give the disputed phrase, two fatal defects appear.

█ In the first place, the last sentence of the quoted paragraph provides that "*Such* production"—that is, whatever production was meant by the first sentence— "shall not be made dependent upon the existence of *a concern* or the functioning of *a concern* in a given field of activity at a given time". (Italics ours.) That provision clearly contemplates that whatever "production" was meant by the preceding sentence might, except for the prohibition, have been made dependent upon the existence of a concern or the functioning of a concern in a given field at a given time. We do not see how the total production from sugar could possibly be dependent upon the existence of *a* concern, or the functioning of *a* concern. Thus read, the sentence does not make sense. It would read: "The expansion, resumption, or initiation of the total production from sugar of all commodities for nonwar use shall not be made dependent upon the existence of a concern or the functioning of a concern in a given field of activity at a given time." Try as we may, we cannot find a rational meaning in such a sentence. It seems to

us that the phrase "production for nonwar use" simply cannot have, in this last sentence, the meaning urged by appellants. And what is not the meaning in the last sentence is likewise not the meaning in the preceding sentences. The phrase has the same meaning throughout, the prior meaning being incorporated in the last sentence by the opening "Such".

█ On the other hand, if "Such production" be read to refer to the production of a given commodity or of a given concern, the sentence does make sense. Permission to expand, resume or initiate production of a given commodity might very well have been influenced by the fact that some competitors normally engaged in that production were still engaged in the performance of needed war contracts. So the prohibition against consideration of that fact makes sense. Similarly, permission to a given concern to expand, resume or initiate production of a given commodity might have been made dependent upon the existence of the concern or its functioning in the field at a given time. So the prohibition against consideration of those facts makes sense. Whatever may be the relative merits of the two contentions on a theoretical basis, it seems to us that the meaning of Congress is fixed indisputably by the last sentence of Section 203 (b). It seems to us, therefore, that regardless of what theoretically the term might properly mean, "expansion, resumption, or initiation of production for nonwar use" must necessarily refer to the production for nonwar use of a given commodity or by a particular concern in a given field.

█ The other fatal defect in appellants' contention on this point is that the statute uses three words, "expansion, resumption, or initiation", in describing the critical event in production, and each word must, if possible, be given a meaning. Appellants say in their brief, "Obviously there has been no 'resumption' or 'initiation' of the use of sugar for all nonwar purposes or for any specific purpose. None of the nonwar uses to which sugar is presently permitted to be put were ever completely eliminated at any time during the war. Thus, the question whether the policies set

forth in Sections 203 (b) and 204 (a) of the Act are operative here is entirely to be determined by the meaning to be given the term 'expansion.'" The argument as thus stated by appellants answers itself. If the meaning they give the words "production for nonwar use" results in reducing the operative impulse of Sections 203 (b) and 204 (a) to the word "expansion", that meaning must be erroneous.

That appellants' interpretation of "production" would eliminate the words "resumption, or initiation" from the statute is clear. There was no material which was totally absorbed by war uses, so that its use for civilian purposes could be "resumed", and none which has not heretofore been used for civilian purposes and which, therefore, could be "initiated". So, if "production" means total production from a given material, the words "resumption, or initiation" would have no meaning. On the other hand, there were many concerns which suspended nonwar production and could, therefore, resume; and there were many products of which production was suspended and could be resumed; and, of course, there are many new concerns which could initiate production. So if "production" means that of a given concern or of a given commodity, the whole sentence has meaning. Thus read, the three words "expansion, resumption, or initiation" all have meaning.

The meaning which we find in the words of the statute upon analysis of the whole section coincides with that which we find in a mere reading, and fits into what seems to us to be the dominant purpose and objective of the Act. It was the meaning found by the District Court, and we agree with it.

 It seems to us that Congress meant that when materials are available to permit the expansion, resumption, or initiation of the production of a given commodity for nonwar use, or such production by a given concern, permission so to expand, resume, or initiate shall not be denied because of the engagements of other competitors, or made dependent upon the existence or the functioning of the particular concern in that field at any given time.

Those specified considerations are denied the Administrator in the making of allotments, which is the only means provided by Congress for giving, withholding, or controlling permission to produce.

As his next point, the Administrator says that even if the Act is operative, it does not invalidate the Amendment complained of. He says that the "existence" of a corporation referred to in the statute, is its "existence, as a corporate entity, prior to August 26, 1946." He says further that the statutory reference to "the functioning of a concern in a given field of activity at a given time" means "that a corporation which was in existence, as a corporate entity prior to August 26, 1946, could not be excluded from receiving an allocation of sugar because it was not in the business of producing bulk sweetened condensed milk prior to August 26, 1946." He argues that "existence of a concern" means its mere existence in a certain form, and that "functioning" means merely being in the business.

 There are several fallacies in the argument. (1) The contention as to the meaning of "existence" is well enough when illustrated by a corporation, but it fails when attempt is made to apply it to a sole proprietorship. The statute says "concern" and obviously, for many reasons, includes individuals. But to say that production by an individual should not be dependent upon his mere "existence" in human form at a given time would not make sense. Appellee company says that the complete phrase of the statute is "existence of a concern in a given field of activity at a given time", and means the presence or participation of the concern in a particular industrial activity at a given time. Thus read, the expression makes sense and is reasonable.

(2) The contention that "functioning" means merely being in the business and has no quantitative or other additional meaning, fails in several respects. To function means "to fulfill its function; to act; operate; work; as the engines failed to function." Webster's New International Dictionary. "Function" means something more than mere being; it means a quanti-

tative accomplishment. But more persuasive is the fact that to give "functioning" the meaning of merely being in the business requires a queer separation of the phrases in the sentence. The Administrator meets this frankly. He says that the phrase "at a given time" modifies "existence" but that the phrase "in a given field of activity" does not. He must say so, because, otherwise, he would have two expressions, "existence" and "functioning", meaning the same thing. If "functioning of a concern in a given field of activity" means merely being in that business, "existence" in that field would mean nothing additional or different. We think both expressions have meaning and that the statute refers to the existence of a concern in a given field of activity at a given time, and to its functioning in that field at a given time. We also think that "functioning" includes elements of means, method and extent, not included in mere "existence". Thus read, the statute is clear and reasonable.

**(3)** The contention that the statute refers only to August 26, 1946, or to any other specific date selected by the Administrator, would render the statute meaningless. "A given time" means any given time. The Administrator cannot select August 26, 1946, and by not making allotments depend upon existence or functioning on that day, thereby validly make them dependent upon existence or functioning in 1944, or 1945, or some other period of time or date.

Appellants press upon us the argument that their construction of the Act must be taken to have been ratified by the Congress subsequent to the enactment of the Act. They are entirely candid in their presentation. They find no specific legislative statements as to the meanings of Sections 203 (b) and 204 (a) of the Act in this respect prior to its passage, and so state. Neither do they point to any such specific reference after the enactment. Moreover, the reenactment upon which they rely is not of this particular Act, but of the Second War Powers Act.

The facts upon which appellants rely on this point are that in 1945 and 1946, subsequent to the passage of the Reconversion Act, Congress was several times informed that the Price Administrator was allocating sugar to some industrial users, although not to the industry involved in this case, upon the historical-use basis. These statements were made to Committees by officials of the Office of Price Administration, and were incorporated in reports of the Committees to Congress at the time Congress was investigating food shortages. Subsequent to those dates, Congress reenacted the War Powers Act, which was the authority for rationing. Appellants say that these facts constitute concurrence by Congress in the administrative action.

Several circumstances deny force to that contention. The Act under consideration was not this Act. Nowhere does it appear that the statements made as to methods of allocation were coupled with reference to the prohibitions or policies of the Reconversion Act. That Congress must have had in mind the one when hearing the other is an assumption. Again, the statements made were in the midst of long official recitations to Committees concerned with the food situation as a whole and as a national problem in its entirety. It would be a strained conclusion, wholly at variance with common experience, for us to say that because such statements appear in the midst of hearings on another problem under another Act, Congress must be deemed to have concurred in an administrative construction greatly limiting, if not fully negativing, a specific prohibitory enactment. The proposition is made clear by reference to new users and to small plants. Amendment 24 specifically excludes new users after August 31, 1946, and makes no special provision for small plants. Surely Congress cannot be said to have concurred in such clear contradiction of its prohibitory enactment.

Moreover, there is foundation for the contention that Congress derived a contrary impression from the testimony cited by appellants. The same witnesses who told the Committees about the use of the historical-use basis, also explained the use of the provisional-allowance basis in some industries, specifically mentioning the one involved in the case at bar, and emphasized

the necessity of such basis in those cases. For example, the Deputy Administrator told the Committee, "Issuance of sugar to these users on any other basis would quite likely result in loss of important quantities of foods. For example, failure to make adequate sugar available to process surplus milk supplies into bulk sweetened condensed milk would, in many instances, result in the loss of the milk." [19]

Exactly the same statement was made by other witnesses. The report of the Committee contains the statement, "These firms have a specified quota of sugar per unit of product and get as much sugar as they need, depending upon the amount they are able to produce during any calendar year." [20] Here are direct statements to and by the Congressional Committee upon the allocation of sugar to the industry involved in the present case.

The Acting Assistant Administrator of the Production and Marketing Administration, Department of Agriculture, told the Select Committee to Investigate the National Defense Program, that his Department understood that the Reconversion Act became operative in respect to a given industry when the allocation of materials, in that instance inedible fats and oils, to that industry increased.[21]

If conclusions are to be drawn from testimony on these other matters, some justification appears for a contention that as to this company and this industry Congress approved only and specifically the provisional-allowance basis.

 As the Supreme Court said in another case,[22] "That both sides invoke the same extrinsic aids, one to fortify and the other to nullify the conclusion we have reached, in itself proves what dubious light they shed. What was said in Committee Reports, and some remarks by the proponent of the measure of the Senate, are sufficiently ambiguous, insofar as this narrow issue is concerned, to invite mutually destructive dialectic, but not strong enough either to strengthen or weaken the force of what Congress has enacted."

 Even the reenactment of a specific clause of a statute after that clause itself has been administratively or judicially construed, is "merely one factor in the total effort to give fair meaning to language." [23] That circumstance must give way to plain language or basic purpose. Where Congress has not reenacted, but has merely remained silent, the force of the argument is even less. "To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities." [24] We cannot search the mind of the Congress for an implied concurrence upon so tenuous a relationship between the premise and the conclusion. We must construe the Act with the other aids available to us.

We are not impressed by the in terrorem argument that the order of the District Court would wreck the sugar rationing program. For four years, from 1942 to 1946, the Administrator allotted sugar upon the "provisional allowance basis", under which, as we have said, each manufacturer was allotted the sugar needed to process the milk he had received. To be sure, that method was then applied to an unrestricted total allotment to the industry. But nothing is shown to convince us that it could not be applied with equal facility and precision to the allotment among individual concerns of a restricted total to the industry. Under the "historical-use" method, the individual allotment is conformed to the predetermined restricted total by the application of a simple factor (in this case 50 per cent) to the "historical-use" premise. We see no reason why a similar factor could not be applied to a premise computed by current needs, the same figure which, unreduced,

[19] Hearings before Special Committee to Investigate Executive Agencies, House of Representatives, 79th Cong., 1st Sess., pursuant to H.Res. 88 (1945) 868.

[20] H.R.Rep.No.602, 79th Cong., 1st Sess. (1945) 3.

[21] Hearings before that Committee, 79th Cong., 2d Sess., Part VII (1946) 1841.

[22] Federal Communications Commission v. Columbia Broadcasting System, 1940, 311 U.S. 132, 61 S.Ct. 152, 154, 85 L. Ed. 87.

[23] Ibid.

[24] Helvering v. Hallock, 1940, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 125 A.L.R. 1368.

was the measure of allotment prior to November, 1946. To be specific, if the needs of the industry, computed in accordance with Order 3 before its Amendment 24, were 200,000 tons for 1946, the industry would have been allotted that amount, and each user would have been allotted the amount of his actual need. We see no reason why, if the Secretary and Administrator determine, upon consideration of the total available sugar and the needs of other industries, that this industry should receive only 100,000 tons, the individual allotments should not be computed upon 50 per cent of the need of each. That the figures are available and usable and the process familiar to the authorities and the industry, is proven by the four years' use of them. The effect of such a procedure upon the whole national economy would be the same as the effect of the historical-use formulæ, since the total amount of sugar going to this industry would be the same in either event. The great difference would be that whereas, under the historical-use basis, the production of a given concern is made dependent upon past existence and performance, under some such modified provisional-allowance method the allotment would depend upon present readiness, ability and willingness, and would permit production by new concerns. The statute seems to require the latter and to prohibit the former.

We are not to be understood by the foregoing as suggesting to the Administrator what he should do. We are merely exploring his argument, earnestly and ably presented by his counsel, that the enjoining of those provisions of Amendment 24 which make individual allotments of sugar dependent upon the operations of a concern at a given past time, deprives him of all possible methods of allocating sugar and destroys the rationing program. We cannot find the factual justification of his protestations. We do not question, and would not attempt to control, his determination that this industry as a whole should receive a restricted amount of sugar during short supply. In his "Rationale" accompanying Amendment 24, he asserts that determination as the reason for the Amendment. We do not see how or why the historical-use basis is the only method of allotting among users a restricted industry total. Nor does it appear necessary that the industry total be computed by an historical-use formula. The available materials are those presently available. Their allotment among industries is obviously upon present considerations. A translation of present circumstance into a mathematical proportion of past performance does not seem necessary.

We note at this point that the injunction order of the District Court is not a sweeping invalidation of rationing or allotments. It is couched in the language of the statute. It enjoins appellants only from carrying out such provisions as make the quota dependent upon the existence of any concern or the functioning of any concern in the bulk sweetened condensed milk manufacturing industry at any given time, or contain restrictions which prevent any small plant, capable and desirous of participating in the expansion, resumption, or initiation of production of bulk sweetened condensed milk from so participating in such production. Those are the terms of the prohibition of the statute. The injunction of the court merely places upon the injunction of the Congress the enforcing power of the judiciary. It directs the Administrator not to do what Congress directed him not to do.

The judgment and order of the District Court will be affirmed.

Affirmed.

EDGERTON, Associate Justice (dissenting).

I think the judgment should be reversed for three reasons, each independent of the other two.

1. The District Court had no jurisdiction to review the Administrator's order. The Administrator's authority to ration sugar is derived from § 301 of the Second War Powers Act, 56 Stat. 177, 50 U.S.C.A. Appendix, § 633. This same section as amended, 58 Stat. 827, 50 U.S.C.A. Appendix, § 633, provides that "The district courts of the United States are hereby given exclusive jurisdiction to enjoin or set aside, in whole or in part, any order suspending any priority or allocation * * *". This

272

provision shows,[1] and its legislative history[2] confirms beyond dispute, the intention of Congress that allocation orders other than suspension orders should not be subjected to judicial review. The Act therefore precludes review of such other orders, including the order in suit. For "except when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."[3] The Supreme Court has said: "Congress has long delegated to executive officers or executive agencies the determination of complicated questions of fact and of law. And where no judicial review was provided by Congress this Court has often refused to furnish one even where questions of law might be involved."[4]

It is true, as this court points out, that the question whether the rationing order in suit is consistent with the War Mobilization and Reconversion Act depends upon how that Act is construed and not upon disputed facts. It may be true, as the court apparently assumes, that substitution of the court's for the Administrator's construction of the Act will prove profitable to appellee. The Constitution does not, for all that, prevent Congress from making the Administrator's construction final. State of Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561; United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259. In other words the Constitution does not require that a rationing program which is at least a reasoned attempt to comply with the law shall be subjected to judicial review. There is no question of arbitrary action in this case.

The great bulk of the total sugar supply of industrial users is allocated on a historical-use basis. If the present decision stands it will not long stand alone, and all this will have to be changed. The creation of a rationing system is a complicated business that demands the knowledge and skill of experts in the field. Courts are not equipped either to create such a system or to appreciate fully the consequences of destroying one. Accordingly Congress gave them neither function. This court is destroying such a system on the strength of a disputed interpretation of a complicated statute and despite the Administrator's warning that timely substitution of a different system may be impossible. This seems to me contrary both to law and to the public interest. It is what Congress sought to prevent. Judges to whom a statute is novel do not necessarily understand it better than executive officers who have lived with it for years. Congress acted on the reasonable theory that, except with regard to suspension orders, any possible superiority of judicial over executive understanding of the law would be outweighed by the delay, confusion and obstruction which judicial review of rationing would produce.

2. The requirements of §§ 203(b) and 204 of the War Mobilization and Reconversion Act[5] on which appellee relies are not applicable in this case, because there has been no "expansion, resumption, or initiation" of nonwar production which requires sugar. The following discussion relates to § 203(b). The point is even clearer with regard to § 204.

Section 203(b) provides: "The executive agencies exercising control over manpower, production, or materials shall permit the *expansion, resumption, or initiation of production for nonwar use* whenever such production does not require materials, components, facilities, or labor needed for war purposes, or will not otherwise adversely affect or interfere with the production for war purposes. *Such production for nonwar use* shall be permitted regardless of whether one or more competitors normally engaged in the same type of production are still

---

[1] Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 305, 64 S.Ct. 95, 88 L.Ed. 61, illustrates the principle.

[2] Senate Report No. 1301, 78th Cong., 2d Sess., p. 2; Hearings before the Committee on the Judiciary, House of Representatives, 78th Cong., 2d Sess., on H. R. 4993, Serial No. 20, 1944, p. 83.

[3] Estep v. United States, 327 U.S. 114, 120, 66 S.Ct. 423, 426.

[4] Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 303, 64 S.Ct. 95, 98, 88 L.Ed. 61.

[5] 58 Stat. 787, 50 U.S.C.A.Appendix, §§ 1658, 1659.

engaged in the performance under any contract which is needed for the prosecution of the war, and *shall not be made dependent upon the existence of a concern or the functioning of a concern in a given field of activity at a given time."* [6]

·That § 203(b) does not become effective until an "expansion, resumption, or initiation of production for nonwar use" has been[7] permitted appears both from its opening sentence and from the statement of policy at the beginning of § 203, on which statement § 203(b) directly depends: "Curtailments of war production or terminations of war contracts shall be integrated and synchronized with the *expansion, resumption, or initiation* of production for other war purposes, and, to the greatest extent compatible with the effective prosecution of the war, *of production for nonwar use.* To effectuate this policy—"

"Production for nonwar use" is a very broad and general term. There are no limiting words in its context, either in the opening statement of policy or in § 203(b) itself, except those that preclude use of materials etc. required for war purposes. Yet appellee and this court would give to the broad and general term a narrow and specific meaning, as if it read "production *of any particular commodity or by any particular concern* for nonwar use." I can find no basis for this interpolation. The context does not suggest it[8] and the purpose of § 203(b) excludes it. That purpose was to make available for nonwar use materials no longer needed for war use. The question whether a given amount of a given material is no longer needed for war use and can be diverted to nonwar use is entirely independent of the particular commodity, and likewise of the particular concern, to which it is to be diverted. At the time the Act was passed the question, when allocation of sugar to "production for nonwar use" could be increased without using materials "needed for war purposes," was in-

telligible and vital. To answer it one had to determine total supply of sugar and also war needs for sugar, but nothing else. The question when allocation of sugar to production of candy, or chocolate candy, or chocolate peppermint candy, or bulk sweetened condensed milk, or to production by a particular concern, for nonwar use could be increased without using materials needed for war purposes would not only have been less vital and less intelligible; it would have been completely impossible to answer. For in order to answer such a question with regard to any one particular nonwar use, or with regard to any one concern, the Administrator would have had to determine previously the amount of sugar that was to be allocated to every other nonwar use, or to every other concern. Appellee's interpolation in § 203(b) would therefore make it like the fabulous statute which required that whenever two railroad trains approached a grade crossing at the same time, each should stop and neither should proceed until the other had proceeded. Without appellee's interpolation, § 203(b) propounds no such riddle. The "production for nonwar use" with which it deals is simply nonwar production which requires critical "materials, components, facilities," etc. The Act does not and the court should not particularize the term further.

Since October of 1944, when the War Mobilization and Reconversion Act was passed, there has been no "expansion, resumption, or initiation" of nonwar production which requires sugar. Because such production, unlike various other sorts of nonwar production, was never stopped, it could not be resumed or initiated. It has not been expanded. On the contrary, the amounts of sugar allocated to civilian industrial use[9] were less in 1945, and also in 1946, than they were in 1944. Since there are seasonal variations in the industrial use of sugar it is also relevant that the amounts so allocated were less in each quarter of

---

[6] Italics in this and the following pargraph supplied.

[7] Or should be. Appellee's contention is not that the Administrator should permit expansion, etc., but that he has actually done so.

[8] The majority of the court read § 203 (b) backward, and modify its first sen-

tence to produce conformity with their understanding of its second. If the two sentences are read in the order in which Congress wrote them, there is no occasion to modify either.

[9] Also the amounts allocated to civilian use of all sorts.

1945, in each quarter of 1946, and in the first quarter of 1947, than they were in the corresponding quarters of 1944.

The second sentence of § 203(b) contains the words on which appellee chiefly relies: "Such production for nonwar use * * * shall not be made dependent upon the existence of a concern or the functioning of a concern in a given field of activity at a given time." "Such production" means "that sort of production"; production of the sort which is expanded in accordance with the preceding sentence of § 203(b).[10] Congress did not require the Administrator to divide a merely constant, or a diminishing, available sugar supply among an unlimited number of new industrial users. So wasteful a use of so essential a resource would not promote but retard "war mobilization and reconversion."

Since nonwar production which requires sugar has not been expanded, the second sentence of § 203(b) has not come into effect with regard to sugar.

3. Even if the Administrator's order were judicially reviewable and §§ 203(b) and 204 were presently applicable appellee would be entitled to no relief. These sections, if they were applicable, would not entitle appellee to anything of which the Administrator's order deprives it.

The second sentence of § 203(b), when applicable, will forbid exclusion of any concern from production on the ground that it was not in existence or was not "functioning * * * in a given field of activity" at a given time. But appellee was in existence and was functioning "in a given field of activity at a given time" which the Administrator's order makes critical. Accordingly, the order does not exclude appellee from production. The order does not exclude appellee from production either because it was not in existence at a different time, or because it was not functioning at a different time, or for any other reason. That some other concern with a different history might or would be excluded from production by the Administrator's order can, of course, give appellee no standing to sue.

Section 203(b) deals with only two topics: (1) when and how far expansion, etc., of production for nonwar use shall be permitted, and (2) who shall be entitled to participate in such expanded production when it is permitted. Appellee assumes that this section deals also with an additional topic, viz. (3) on what principles and in what proportions available supplies shall be distributed among the concerns which are to be entitled to participate in such expanded production when it is permitted. This assumption is erroneous. The section does not touch this topic. The legislative history of the Act shows that Congress did not even consider it.

Section 204, when it becomes applicable, will require the Administrator to allocate "a percentage" of available sugar for the exclusive use of "small plants." It does not appear that this has not been done. On the contrary, appellants say and appellee does not deny that all concerns engaged in production of bulk sweetened condensed milk are small plants within the statutory definition, viz., concerns "employing two hundred and fifty wage earners or less." It follows that 100 percent of the sugar allocated to this industry is allocated to such plants.

---

[10] We have recently held that the word "such" in a different sort of statute has precisely this sort of effect. Nieves v. United States, — U.S.App.D.C. —, 160 F.2d 11.