Mister RALPHO, Appellant,

v.

J. Raymond BELL, Chairman, Foreign Claims Settlement Commission of the United States, et al.

No. 75–2088.

United States Court of Appeals, District of Columbia Circuit.

Argued April 14, 1976.

Decided March 29, 1977.

Rehearing Denied Sept. 12, 1977.

Jack Lipson, Washington, D.C., with whom Rosalind C. Cohen, Washington, D.C., was on the brief for appellant.

Barbara L. Herwig, Atty., Civ. Div., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., and Ronald R. Glancz, Atty., Civ. Div., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This deceptively difficult case, like *Melong v. Micronesian Claims Commission*,[1] decided today, arises under the Micronesian Claims Act of 1971,[2] which sets up a fund for compensation of losses incurred by Micronesians during World War II and establishes the Commission as the agency to administer the fund. Appellant Ralpho, a claimant, brought suit in the District Court alleging that his right to a fair hearing was abridged by the Commission's reliance upon "secret" extra-record evidence in determining the amount to be awarded him.[3] Ralpho sought mandatory, injunctive and declaratory relief for himself and on behalf of those similarly situated.

Without passing on the propriety of class litigation,[4] the District Court dismissed Ralpho's action for lack of subject matter jurisdiction. The sole basis for the ruling was a provision[5] of the Act advanced as a prohibition on judicial review of any action the Commission might take. Because we conclude that this provision does not foreclose review[6] of the constitutional issue appellant presents,[7] or narrowly limited consider-

1. 186 U.S.App.D.C. ——, 569 F.2d 630.

2. Act of July 1, 1971, Pub. L. No. 92–39, 85 Stat. 92, as amended, 50 U.S.C.App. §§ 2018 et seq. (Supp. II 1972).

3. The Commission itself is not a party to this action; appellees are the various Commissioners and several subordinates who have been sued here in their official capacity.

4. Since the District Court did not address it, we must leave the matter of class treatment for consideration on remand. *Board of School*

*Comm'rs v. Jacobs*, 420 U.S. 128, 130, 95 S.Ct. 848, 850, 43 L.Ed.2d 74, 78 (1975). *Cf. Baxter v. Palmigiano*, 425 U.S. 309, 311 n.1, 96 S.Ct. 1551, 1554 n.1, 47 L.Ed.2d 810, 817 n.1 (1976).

5. 50 U.S.C.App. § 2020 (Supp. II 1972), set out in text *infra* at note 33.

6. See 5 U.S.C. § 701(a)(1) (1970).

7. See Part II–A *infra*, and Part IV *infra*.

ation of the statutory transgression he alleges,[8] we reverse the judgment of dismissal and remand the case to the District Court with instructions on further procedures.

## I. FACTS AND PRIOR PROCEEDINGS

Micronesia is the generic term covering a large number of small islands scattered over vast stretches of the South Pacific. During World War II, Japanese[9] fortifications in Micronesia were targets of a major American offensive. Squarely in the path of the onslaught, on the island of Jaluit, was Ralpho's house. A few years previously Ralpho, who had been a carpenter for a Japanese firm operating in the islands, had built the house himself with the aid of his family, using materials purchased at a discount from his employer. The house and the personalty in it were totally destroyed by American bombardment of the island.[10]

American forces ultimately secured Micronesia and used the islands as staging areas for subsequent operations against Japan. Much land and some personal property were expropriated for American military use. The islands continued de facto in American possession until 1947, when the United Nations designated Micronesia as a Trust Territory and the United States as its administrator.[11] In accepting trusteeship, the United States agreed to discharge certain responsibilities to the Micronesian populace[12] and to abide by Chapter XII of the United Nations Charter,[13] which established the International Trusteeship System.

In their final treaty of peace, the United States and Japan undertook another "duty," binding themselves in principle to compensate those Micronesians who, like Ralpho, had suffered as a result of the hostilities.[14] More than a decade of diplomatic intractability, however, prevented principle from becoming practice.[15] The truculence of the two powers obscured the equities of the Micronesian claims to compensation, and negotiations broke off until the Trusteeship Council of the United Nations issued a strongly worded suggestion that the United States and Japan resume them to fulfill their commitment to the islanders.[16] Finally, in 1969, the two countries effected a compromise by an exchange

---

8. See Part II–B *infra.*

9. The Micronesian islands were governed by Japan under a League of Nations mandate between the World Wars. This mandate they violated by conducting extensive military operations in the mandated territory. See Preamble, Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665 ("Trusteeship Agreement").

10. These facts are not in issue here.

11. Trusteeship Agreement, *supra* note 9, art. 2, 61 Stat. 3301.

12. *Id.* at 3302–3303.

13. Act of June 26, 1945, 59 Stat. 1033, 1048–1050, T.S. No. 993, incorporated by reference into the Trusteeship Agreement, *supra* note 9, 61 Stat. 3302.

14. Multilateral Treaty of Peace with Japan, Sept. 8, 1951, 3 U.S.T. 3169, 3173, art. 4(a), T.I.A.S. No. 2490.

15. The United States took the position that all war-related damage, by whomever inflicted, was the responsibility of the Japanese and

ought to be redressed by them. Japan not only disclaimed responsibility for war damage caused by the United States, but also demanded compensation for all property left behind by the 100,000 Japanese nationals deported from Micronesia to Japan by the United States. Japan contended that their claims would aggregate far more than those of the Micronesians; it reasoned, therefore, that on balance Japan owed nothing and that the onus of paying the Micronesian claims should fall entirely upon the United States. See *Micronesian Claims, Hearings on H.R. J. Res. 1161 Before the Subcomm. on Int'l Orgs. and Movements of the House Comm. on Foreign Affairs*, 91st Cong., 2d Sess. 20–22 *et passim* (1970) (statement of Stephen M. Schwebel) ("*1970 House Hearings*"); *Micronesian Claims Act of 1971, Hearings on H.R. J. Res. 521 Before the Subcomm. on Int'l Orgs. and Movements of the House Comm. on Foreign Affairs*, 92d Cong., 1st Sess. 37–46 *et passim* (1971) (statement of Stephen M. Schwebel) ("*1971 House Hearings*").

16. 31 U.N. TCOR Supp. (No. 2) (1964); see also 34 U.N. TCOR Supp. (No. 2) 33–37, U.N. Doc. T/1668 (1968).

of diplomatic notes.[17] Each disclaimed legal liability for injuries visited upon the Micronesians during the war,[18] but agreed to contribute *ex gratia* the equivalent[19] of $5 million to a fund, to be administered by the United States as trustee, for the satisfaction of all Micronesian "presecure" claims—those arising before the islands were secured to the United States.[20]

Two more years of waiting followed while Congress considered various plans for administering the fund. After several false starts, Congress enacted the Micronesian Claims Act of 1971.[21] The Act established a five-member Micronesian Claims Commission[22] to distribute both the presecure fund under Title I and, under Title II, a fund of $20 million for the satisfaction of certain "post-secure" claims against the United States.[23] The Act also imposed a strict timetable: All claims were to be filed within one year[24] and the Commission was to wind up its affairs no later than three years after the filing deadline.[25] To promote this degree of expedition, the Commission was required to give extensive publicity to its activities[26] and to provide assistance to Micronesians in preparing claims.[27] Initial decisions were to be made on the basis of the claimant's filing,[28] and a hearing was to become available only upon request of a claimant dissatisfied with the initial award.[29] Since the $5 million fund was intended to satisfy all presecure claims, if necessary by proration[30], payment might be delayed in the discretion of the Secretary of the Interior,[31] and no one would receive payment who had not executed a full release to the United States and Japan for any alleged liability on the claim.[32] Section 2020 of the Act provided additionally that

> any such settlements made by such Commission and any such payments made by the Secretary [of the Interior] under the authority of title I or title II . . . shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review.[33]

During its early work in Micronesia, the Commission was alerted to the difficulty of determining the value that Micronesian properties had in the early 1940's. This difficulty was partly attributable to the lamentable passage of time between the war and the creation of the Commission, but it was also a consequence of the primi-

---

17. Agreement on the Trust Territory of the Pacific Islands, Apr. 18, 1969, United States–Japan, 20 U.S.T. 2654, T.I.A.S. No. 6724 ("Agreement on Trust Territory").

18. *Id.*; see *1970 House Hearings, supra* note 15, at 24 *et passim.*

19. Japan's contribution was to be made in the form of goods and services, while that of the United States was to be in specie. Agreement on Trust Territory, art. I, *supra* note 17, 20 U.S.T. at 2654–2655.

20. See 50 U.S.C.App. § 2019c(a)(1) (Supp. II 1972).

21. 85 Stat. 92 (July 1, 1971), codified as 50 U.S.C.App. §§ 2018–2020b (Supp. II 1972).

22. 50 U.S.C.App. § 2019b(a).

23. 50 U.S.C.App. § 2020a.

24. *Id.* at § 2019b(d).

25. *Id.* § 2019b(e). See Part III *infra.*

26. *Id.* § 2019b(d).

27. *Id.*

28. *Id.* § 2019c(a). *Cf.* the Commission's Regulations § 592.8, 1973 Foreign Claims Settlement Comm'n Annual Report, at 62 ("1973 FCSC Ann.Rep.").

29. 50 U.S.C.App. § 2019c(a). See the Commission's Regulations §§ 593.1–593.2, 593.4, 1973 FCSC Ann.Rep., *supra* note 28, at 63.

30. 50 U.S.C.App. § 2019c(c).

31. As originally adopted, the Act provided that "[w]hen all claims have been adjudicated, the Commission shall certify them to the Secretary [of the Interior] for payment," except that some portion of death claims could be paid immediately. Micronesian Claims Act of 1971, § 104(a), 85 Stat. 95. In 1973, this section was amended to provide that "[a]s claims are adjudicated, the Commission shall certify them to the Secretary for payment in such manner as he may direct." 87 Stat. 461 (Oct. 19, 1973).

32. 50 U.S.C.App. § 2019c(d).

33. 50 U.S.C.App. § 2020.

tive economy of Micronesia under Japanese mandate,[34] much of which was conducted on a nonmonetary barter basis. To facilitate disposition of claims, then, the Commission conducted interviews and examined records of various sorts in order to get a composite picture of the average wartime values of goods and services in Micronesia.[35] The results of this survey were assembled in a guide about 40 pages in length, resembling a price list, which was frequently updated and expanded as the need arose.[36] In its 1973 annual report, the Commission explained that the study was consulted "in the absence of better evidence" on the issue of value and that sparse presentations by claimants often made such consultation necessary.[37]

With the assistance of an English-speaking representative, Ralpho filed a claim for the destruction of his house. The only information in the filing that could have given the Commission a clue to its value was Ralpho's estimate of $234.40 as the amount of damage[38] and his statement that the

structure was 32 by 34 feet in size.[39] The Commission's August 15, 1973, award, set out in pertinent part in the margin,[40] declared that the Commission had made the study and that, "upon consideration of the record, including the Commission's study," Ralpho was entitled to $370. In the study, the value of a "Trukese" style house was listed as 34 cents per square foot,[41] and at that rate Ralpho's house was worth $369.92.

Ralpho requested a hearing and thereafter, on January 7, 1974, his counsel[42] asked that the value study be made available for inspection and copying under the Freedom of Information Act.[43] This request the Commission's chief counsel refused.[44] At the hearing on January 17, Ralpho testified that the materials with which the house was constructed, which he purchased from his employer for $210.96, would have cost $234.40 if bought elsewhere. He estimated the value of the family labor used at $86.73. Another witness by stipulation an expert carpenter, testified that in 1940 Ralpho's house would have cost $656.32 to build.[45]

---

34. See 1973 FCSC Ann.Rep., *supra* note 28, at 43.

35. *Id.* at 43–44.

36. App. 111–143 *et passim.*

37. 1973 FCSC Ann.Rep., *supra* note 28, at 44.

38. App. 73. Ralpho's estimate was made in yen, the currency in use during the Japanese regime. For purposes of clarity, we convert all value figures to dollars where necessary, using the parties' conversion rate of 100 yen to $23.44. See *Mr. Ralpho*, Claim No. 2055–J, Dec. No. 90 (final decision Apr. 12, 1974) (unreported) App. 109.

39. App. 76.

40. *Mr. Ralpho*, Claim No. 2055–J, Dec. No. 90 (initial decision Aug. 15, 1973) (unreported) App. 19–20.

> Based on the entire record, . . . the Commission finds that claimant, MISTER RALPHO, was the owner of a dwelling; and the dwelling was destroyed . . . as a result of the hostilities between the Governments of Japan and the United States. . .
>
> * * * * * *
>
> In determining the value of property, the Commission has made a study concerning the value of property during World War II in Micronesia.

> Upon consideration of the record, including the Commission's study, the Commission finds that claimant's dwelling at the time of loss had a value of Three Hundred Seventy Dollars ($370.00).

Apparently similar notice of the existence and recourse to the study was routinely inserted in each Commission opinion dealing with property loss. See, *e. g., Lomo Jib*, Claim No. 2754–J, Dec. No. 26 (July 6, 1973); FSCS Ann.Rep., *supra* note 28, Exhibit J–7, at 98; *Katib Jili*, Claim No. 3634–J, Dec. No. 154 (Oct. 10, 1973), in *id.*, Exhibit J–12 at 105.

41. App. 112.

42. Not his counsel on appeal.

43. 5 U.S.C. § 552 (1970). See letter from Donald Juneau to Robert Bowles (chief counsel of the Commission), Jan. 7, 1974, App. 21–22.

44. Letter from Bowles to Juneau, Jan. 8, 1974, App. 23–24.

45. *Mister Ralpho*, Claim No. 2055–J, Dec. No. 90 (resume of oral hearing Feb. 11, 1974 (unreported), App. 28. His cost figures, unlike those of Ralpho, were based not on Ralpho's out-of-pocket expenditure, but on the cost that would have been incurred by a contractor constructing a similar house in 1940.

The Commission's post-hearing award merely recited the evidence and gave Ralpho $298 for the house.[46] Thereafter, the value study was released to Ralpho's counsel[47] and Ralpho moved for reconsideration, but that request was denied.[48]

This litigation then commenced. The gravamen of Ralpho's complaint is that the Commission's reliance on the "secret evidence"[49] in the value study without affording Ralpho the opportunity to examine and rebut it is a violation of due process, of the Commission's own regulations, of the law of the Trust Territory, and of the United States' obligation under the United Nations Charter and the Trusteeship Agreement.

The District Court dismissed the action, evidently for lack of subject matter jurisdiction since it construed Section 2020, the aforementioned finality provision of the Micronesian Claims Act,[50] to preclude review. Thus the primary issue on appeal is whether judicial relief is available to Ralpho and, if so, on what basis it may be afforded. We need not address the hydra-like array of possibilities[51] that he suggests, for we find

---

46. *Mister Ralpho* (final decision), *supra* note 38, App.108–110.

47. See Plaintiff's Complaint, App. 11; Defendants' Motion to Dismiss at 6.

48. Plaintiff's Complaint, App. 11. The Commission's brief states that though it does not dispute that allegation, it has no proof that such a request was made or denied. Brief for Appellees at 6 n.2.

49. Plaintiff's Complaint, App. 11. In the posture of this case we must take as true their allegation that the Commission's final decision was predicated upon the value study. It is beyond peradventure that the initial award derived entirely from that guide. See text and notes *supra* at notes 38–41. Although the final award deviates somewhat from a strict mathematical application of guideline values, see text and note *supra* at note 46, it is possible that the Commission used those values as "ball-park" estimates and credited the testimony of Ralpho and his expert only to the degree it was consistent therewith. We note, moreover, that the Commission has never denied that it made use of the value study in determining Ralpho's award, but rather the affidavit submitted by the Commission's general counsel to the District Court implicitly suggested that it served just the purpose described above. Affidavit of Wayland D. McCellan at 2 (November 13, 1974).

50. See text *supra* at note 33.

51. Ralpho's complaint refers us to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity of citizenship), 1350 (Torts against aliens), 1361 (mandamus) and 2201–2202 (declaratory judgment). He also alleges jurisdiction under the review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970), which this court has accepted as a font of federal-question jurisdiction independent of that bestowed by § 1331. That view has now been rejected by the Supreme Court, in *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 985, 51 L.Ed.2d 192, 200–201 (1977), thus raising the question whether § 1331 supports jurisdiction here. We conclude that it does.

Ralpho's case obviously arises under the Constitution and federal laws, and he alleged that the amount in controversy is greater than $10,000. Since his underlying claim involves less than $1,000, it is difficult to see how his allegation might be substantiated, and if it appears to a "legal certainty that the claim is really for less" than $10,000, § 1331 as constituted when this case was submitted would not provide jurisdiction. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848–849 (1938). But § 1331 was amended by the Act of October 21, 1976, Pub.L. No. 94–574, 90 Stat. 2721, to provide that "no such sum or value shall be required in any [federal question] action against the United States, any agency thereof, or any officer or employee thereof in his official capacity." This amendment clearly extended § 1331 to encompass actions such as Ralpho's, as the House Report explained:

> In some . . . cases the jurisdictional amount requirement cannot be met because it is impossible to place a monetary value on the right asserted by the plaintiff.
>
> In other cases, the plaintiff's claim that he is entitled to a Federal grant or benefit . . . may be assigned a monetary value, but the amount in controversy may be $10,000 or less.
>
> * * * * * *
>
> The denial of a federal forum [for federal claims] for lack of the jurisdictional amount may therefore be denial of any remedy whatsoever. Justice clearly requires elimination of this deficiency.

H.R.Rep. No. 1656, 94th Cong., 2d Sess. 14–15, U.S.Code Cong. & Admin.News, pp. 6121, 6134 (1976) (footnotes omitted). *Accord*: S.Rep. No. 996, 94th Cong., 2d Sess. 13–14 (1976). Thus, assuming *arguendo* that Ralpho's controversy is to be valued below $10,000, we may entertain it only if the Act of October 21, 1976, applies to pending cases. Bereft as we are of

that Section 2020 does not "extend"[52] to preclude review[53] of all the theories he advances.

## II. REVIEWABILITY

[1–3] Neither party contests characterization of the Micronesian Claims Commission as an "agency" within the coverage of the Administrative Procedure Act, and we think that characterization is correct.[54] The Commission's main contention is that the legislation of which it is a creature precludes any judicial review of its actions, no matter how offensive to the statute or to

any congressional specification in this regard, we must look to implicit indicia of legislative intent. *Swinton v Kelly*, 180 U.S.App.D.C. 216, 220, 554 F.2d 1075, 1079 (1976), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). *Cf. De Rodulfa v. United States*, 149 U.S.App.D.C. 154, 160, 461 F.2d 1240, 1246, *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).

Congress's chief concern in eliminating *pro tanto* the jurisdictional amount requirement was the injustice wrought by closing the federal courts to those with pecuniarily insignificant but important grievances against the Government. It was, moreover, aware that "[v]irtually all of the . . . ground covered by the [amendment] would be encompassed by existing law" in jurisdictions, such as this circuit, where the Administrative Procedure Act had been taken to be an independent grant of jurisdiction. *Administrative Procedure Act Amendments of 1976: Hearings [on, inter alia, S. 800] Before the Subcomm. on Administrative Procedure of the Senate Comm. on the Judiciary*, 94th Cong., 2d Sess. 106 (1976) (letter of Assistant Attorney General Scalia), reprinted in S.Rep. No. 996, *supra*, at 28; H.R.Rep. No. 1656, *supra*, at 29. *Cf.* S.Rep. No. 996, *supra*, at 15; H.R.Rep. No. 1656, *supra*, at 16. See also *Califano v. Sanders, supra*, 430 U.S. at 104–107, 97 S.Ct. at 983–985, 51 L.Ed.2d at 198–201. Congress did not endorse this interpretation, but it did agree with Professor Kenneth Culp Davis that "Congress should relieve our good judges from [the] unnecessary dilemma" of "avoiding or circumventing [the requirement] altogether in order to avoid injustice." S.Rep. No. 996, *supra*, at 16. *Cf.* H.R. Rep. No. 1656, *supra*, at 16–17. At the same time, elimination of the amount-in-controversy requirement in agency review cases was expected "to result in a more efficient use of judicial resources, with courts and counsel no longer having to waste time and energy" searching for the jurisdictional amount rather than searching for justice to the litigants. S.Rep. No. 996, *supra*, at 16.

Congress fully knew that this "unfortunate gap in the statutory jurisdiction of the Federal courts," H.R.Rep. No. 1656, *supra*, at 14, had ostensibly been bridged in this and other circuits, and deplored the "confusion and injustice" that such judicial engineering meant to forestall, *id.* at 20. Congress as well expressed its preference for judicial economy over wasteful excursions into jurisdictional amount. We are thus persuaded that the remediation wrought by the Act of October 21 was intended to reach at least one category of already-pending cases that had, albeit incorrectly managed somehow to survive this "anachronism," *id.* at 16—those, unembarrassed by the statute of limitations or legal impediment of any other kind, the plaintiff could refile after the Act took effect. We think it entirely reasonable to suppose that in the instance of the suit that clearly can be reinstated, Congress felt it the part of common sense not to require the inconvenience of refiling. Indeed, to insist that Ralpho abandoned his two-year quest for judicial relief— and, since the statute of limitations has not run, to reenter the District Court and retrack all of his litigative steps to date—would frustrate the purpose and policy underlying the new legislation, not only by perpetuating the inequities of prior law but also by calling upon the courts to do the same work twice. *Cf. Swinton v. Kelly, supra*, 180 U.S.App.D.C. at 221, 554 F.2d at 1080. That we decline to do, leaving for another day consideration of the Act's applicability to situations of a different type.

52. See 5 U.S.C. § 701(a)(1) (1970).

53. 5 U.S.C. § 702 (1970).

54. The Administrative Procedure Act's definition of that term excludes territorial governments, 5 U.S.C. § 701(b)(1)(C) (1970), including that of the Trust Territory. See *Saipan v. Department of Interior*, 502 F.2d 90, 95 (9th Cir. 1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). *Cf. Porter v. United States*, 496 F.2d 583, 587, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). The Micronesian Claims Commission, however, is an authority of the United States, unconnected with the Territorial Government. It is "under the control and direction of" the chairman of the International Claims Settlement Commission, 50 U.S.C.App. § 2019b (Supp. II 1972), who is appointed by the President with the advice and consent of the Senate. 22 U.S.C. § 1622(a) (1970). He has almost total control over nonadjudicative functions of the Commission, including tenure of Commission members. 50 U.S.C. App. § 2019b(a) (Supp. II 1972). See 50 U.S.C. App. § 2019b(b), (c), (d) (Supp. II 1972). Disbursement on Commission awards is made by

the Constitution. This position must be evaluated by the Administrative Procedure Act, which, in general, invites judicial scrutiny of the broadest gauge.[55] That invitation is qualified only "to the extent that . . . statutes preclude judicial review,"[56] thus requiring courts to ascertain the *degree* to which Congress may fairly be said to have contemplated that the sole check on bureaucratic activity would be "the self-restraint of the executive branch."[57] In this task, as in others involving divination of congressional intent, we must avail ourselves of the full arsenal of aids to construction, for "what is implicit is as much a part of a statute as what is explicit."[58]

Recourse to canons of construction, statutory history and common sense is no less necessary when a statute's terms appear superficially to preclude review than when they are silent on that subject.[59] As the Supreme Court has noted in this context, "[e]xamples are legion where literalness is out of harmony either with constitutional requirements . . . or with the Act taken as an organic whole."[60] Interpretation of finality language should be guided not only by the "interplay of policy, statute, and regulation,"[61] but also by the recognition that unreviewability gives the executive "a standing invitation to disregard . . . statutory requirements and to exceed the powers conferred";[62] put another way, we ought not lightly to infer that Congress desired such a result.[63] This

---

the Secretary of the Interior. 50 U.S.C.App. §§ 2019, 2020a.

Neither is the Commission otherwise exempt from the purview of the Administrative Procedure Act. That legislation was intended to "cover a broad spectrum of administrative actions," *American Fed'n of Gov't Employees v. Callaway*, 398 F.Supp. 176, 187 (N.D.Ala.1975), and both this circuit and the Supreme Court have taken care to give the Act the broad sweep Congress contemplated. See *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 16, 94 S.Ct. 1028, 1036, 39 L.Ed.2d 123, 135 (1974); *Ramer v. Saxbe*, 173 U.S.App.D.C. 83, 85, 522 F.2d 695, 697 (1975); *Soucie v. David*, 145 U.S.App.D.C. 144, 150–152, 448 F.2d 1067, 1073–1075 (1971). *Cf. National Treasury Employees v. Nixon*, 160 U.S.App.D.C. 321, 334–335, 492 F.2d 587, 600–601 (1974); *Amalgamated Meat Cutters v. Connally*, 337 F.Supp. 737, 744–745 (D.D.C.1971). See also K. Davis, Administrative Law of the Seventies § 1.01–1 (1976); H. Leventhal, Book Review, 44 U.Chi.L. Rev. 260, 262 and n. 8 (1976). We find the Commission well within that sweep.

**55.** 5 U.S.C. § 706(2) (1970) provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (B) unconstitutional; (C) in violation of statute; (D) "without observance of procedure required by law;" or (E) and (F), unsupported under the test proper for evaluating agency findings of fact.

**56.** 5 U.S.C. § 701(a)(1) (1970).

**57.** *Fleming v. Moberly Milk Prods. Co.*, 82 U.S. App.D.C. 16, 22, 160 F.2d 259, 265, *cert. dismissed*, 331 U.S. 786, 67 S.Ct. 1304, 91 L.Ed. 1816 (1947).

**58.** 4 K. Davis, Administrative Law § 28.08 at 37 (1958). See Note, *Statutory Preclusion of Judicial Review under the Administrative Procedure Act*, 1976 Duke L.J. 431, 437–449.

**59.** "Each statute . . . must be examined individually; its purpose and history as well as its text are to be considered in deciding whether the courts were intended to provide relief for those aggrieved by administrative action. Mere failure to provide for judicial intervention is not conclusive; neither is the presence of language which appears to bar it." *Heikkila v. Barber*, 345 U.S. 229, 233, 73 S.Ct. 603, 604–605, 97 L.Ed. 972, 976 (1953) (footnote omitted). See also *Stark v. Wickard*, 321 U.S. 288, 306–307, 64 S.Ct. 559, 569–570, 88 L.Ed. 733, 746 (1944).

**60.** *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 238, 89 S.Ct. 414, 417, 21 L.Ed.2d 402, 406 (1968) (citations omitted). *Cf. Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co.*, 415 F.2d 403, 412 (5th Cir. 1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970) ("[t]here is nothing unusual in whittling finality language down to size. . . ."); 4 K. Davis, Administrative Law § 28.01 at 2–3 (1958).

**61.** *Caulfield v. Department of Agriculture*, 293 F.2d 217, 228 (5th Cir. 1961) (Wisdom J., dissenting), *cert. dismissed*, 369 U.S. 858, 82 S.Ct. 946, 8 L.Ed.2d 16 (1962).

**62.** B. Schwartz, Administrative Law § 147 at 439 (1976).

**63.** See cases cited *infra* at notes 77–78, 103–108. *Cf. Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61, 64 (1943) ("[i]f the absence of jurisdiction of the federal courts meant a sacrifice

lesson learned, we must inquire as to the extent that Section 2020 of the Micronesian Claims Act [64] affects judicial review of the Commission's actions in Ralpho's case.

## A. Reviewability of Constitutional Questions

Ralpho claims, *inter alia*, that the Commission's putative reliance on evidence to which he had neither access nor opportunity to address violates the Due Process Clause of the Fifth Amendment. At the outset, we note that whatever the merit of this position, that constitutional provision binds the Commission and Ralpho is entitled to demand its protections.[65] We are mind-

ful that Article IV of the Constitution confers upon Congress broad power [66] to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," [67] and that the extent to which that power may be used to deny constitutional safeguards to those not within the United States but under its dominion is a matter of some controversy.[68] We need not in this case choose among the conflicting interpretations of Congress' Article IV powers, however, because even under the most restrictive standard [69] it is settled that "there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of

or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control"). See also *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, 686–687 (1967); *Associated Elec. Coop., Inc. v. Morton*, 165 U.S.App.D.C. 344, 507 F.2d 1167 (1974), *cert. denied*, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975); *Independent Bankers Ass'n v. Board of Governors of Federal Reserve Sys.*, 163 U.S. App.D.C. 144, 500 F.2d 812 (1974). See generally K. Davis, Administrative Law of the Seventies § 28.08 (1976).

**64.** See text *supra* at note 33.

**65.** Since "[i]t is the locality that is determinative of the application of the Constitution, in such matters [as the one at bar], and not the status of the people who live in it," *Balzac v. Porto Rico*, 258 U.S. 298, 309, 42 S.Ct. 343, 347, 66 L.Ed. 627, 632 (1922); see *Canal Zone v. Scott*, 502 F.2d 566, 568 (5th Cir. 1974), Ralpho's status under the Trusteeship Agreement as a national of the Trust Territory, rather than the United States, is of no significance.

**66.** See, *e. g., Inter-Island Steam Navigation Co. v. Hawaii*, 305 U.S. 306, 314, 59 S.Ct. 202, 206, 83 L.Ed. 189, 195 (1938); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317, 57 S.Ct. 764, 768–769, 81 L.Ed. 1122, 1130 (1937); *Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 43, 10 S.Ct. 792, 803, 34 L.Ed. 478, 491 (1890); *National Bank v. County of Yankton*, 101 U.S. 129, 133, 25 L.Ed. 1046, 1047 (1880).

**67.** U.S.Const. art. IV, § 3, cl. 2.

**68.** Compare *Reid v. Covert*, 354 U.S. 1, 9, 77 S.Ct. 1222, 1226, 1 L.Ed.2d 1148, 1159 (1957) (Black, J., plurality opinion), with *id.* at 53, 77

S.Ct. at 1249, 1 L.Ed.2d at 1183 (Frankfurter, J., concurring), and *id.* at 67, 77 S.Ct. at 1256, 1 L.Ed.2d at 1191 (Harlan, J., concurring).

**69.** The traditional "fundamental rights" theory, see *Church of Jesus Christ of Latter-Day Saints v. United States, supra* note 66, 136 U.S. at 44, 10 S.Ct. at 803, 34 L.Ed. at 491, like its kindred doctrine applying to the states specific guaranties of the Bill of Rights by incorporation via the Fourteenth Amendment, has necessitated provision-by-provision determinations as to "how far the bill of rights . . . is of general and how far of local description," *Downes v. Bidwell*, 182 U.S. 244, 277, 21 S.Ct. 770, 783, 45 L.Ed. 1088, 1102 (1901), in any territory determined to be "unincorporated" into the United States. In *Reid v. Covert, supra* note 68, 354 U.S. at 9, 77 S.Ct. at 1226, 1 L.Ed.2d at 1159, four Justices criticized this mode of determining when the Constitution follows the flag as an illogical and disingenuous "picking and choosing among the remarkable collection of 'Thou shalt nots' . . . explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments"; they would have confined it, therefore, to the provisions to which it had previously been applied. Two other Justices concurred separately, reaffirming their faith in the "fundamental rights" doctrine. *Id.* at 53, 77 S.Ct. at 1249, 1 L.Ed.2d at 1183 (Frankfurter, J., concurring); *id.* at 67, 77 S.Ct. at 1256, 1 L.Ed.2d at 1191 (Harlan, J., concurring). See also *King v. Morton*, 172 U.S.App.D.C. 126, 140, 520 F.2d 1140, 1154 (1975) (Tamm, J., dissenting); L. Henkin, Foreign Affairs and the Constitution 268–272 (1972). See generally *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224–225, 73 S.Ct. 625, 635–636, 97 L.Ed. 956, 969–970 (1953) (Jackson, J., dissenting).

law . . . ." [70] Of course, the United States does not hold the Trust Territory in fee simple, as it were, but rather as a trustee; [71] yet this is irrelevant to the question. That the United States is answerable to the United Nations for its treatment of the Micronesians does not give Congress greater leeway to disregard the fundamental rights and liberties of a people as much American subjects as those in other American territories. [72] We thus find the actions of the United States in the Trust Territories constrained by due process.

The question, then, is whether the Micronesian Claims Act suffers a court to hearken to Ralpho's due process complaint. Important tenets adjure needless determination of constitutional issues [73] and, as a corollary, command interpretation of legislation to avoid constitutional doubts as well as constitutional encounters if it is fairly susceptible of such a construction. [74] These admonitions are to be observed when a statute is advanced to outlaw judicial review of action trenching on constitutional rights, as the Supreme Court's holding in *Johnson v. Robison* [75] demonstrates. There challenge was made to the facial validity of a veterans' benefit statute, and the Government urged that judicial consideration of the statute's constitutionality was barred by a provision [76] purporting to render all administrative decisions under the statute final and unreviewable. The Court noted that a construction of the finality provision that foreclosed inquiry into the constitutionality of the challenged legislation would

70. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 669 n. 5, 94 S.Ct. 2080, 2084 n. 5, 40 L.Ed.2d 452, 460 n. 5 (1974), quoting *Mora v. Mejias*, 206 F.2d 377, 382 (1st Cir. 1953). Accord, *Figueroa Ruiz v. Delgado*, 359 F.2d 718, 723 (1st Cir. 1966); *Soto v. United States*, 273 F. 628 (3d Cir. 1921). See *Balzac v. Porto Rico*, *supra* note 65, 258 U.S. at 313, 42 S.Ct. at 348, 66 L.Ed. at 634 (noting the necessity that the Government be subject to the constraints of due process in the territories). *Cf. Downes v. Bidwell, supra* note 69, 182 U.S. at 282, 21 S.Ct. at 785, 45 L.Ed. at 1104 ("[w]e suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights, which are peculiar to our own system of jurisprudence. Of the former class are . . . the right[] . . . to free access to courts of justice, to due process of law and to an equal protection of the laws"); *id.* at 373, 21 S.Ct. at 820, 45 L.Ed. at 1139) (Fuller, C. J., dissenting); see also *Schlothan v. Alaska*, 276 F.2d 806 (9th Cir.), *cert. denied*, 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1022 (1960).

71. Article 3 of the Trusteeship Agreement, *supra* note 9, 61 Stat. 3302, subjects the power of the United States as administering authority over the Trust Territory to the provisions of the Trusteeship Agreement. The language proposed by the United States for Article 3 included the phrase "as an integral part of the United States," but this language was deleted from the final draft in order to clarify that the Trusteeship Agreement did not provide for the extension of United States sovereignty over the territory. See 1 M. Whiteman, Digest of International Law § 41 at 777–778 (1963).

72. *Cf.* the remarks of the United States Representative to the United Nations Security Council Meeting considering the award of the trusteeship to the United States: "My government feels that it has a duty toward the peoples of the Trust Territory to govern them with no less consideration than it would govern any part of its sovereign territory." *Id.* at 778.

73. See, *e. g., Ashwander v. TVA*, 297 U.S. 288, 345–348, 56 S.Ct. 466, 482–483, 80 L.Ed. 688, 710–712 (1936) (Brandeis, J., concurring).

74. *E. g., Johnson v. Robison*, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165–1166, 39 L.Ed.2d 389, 398 (1974); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404–1405, 28 L.Ed.2d 822, 830 (1971); *United States v. Rumely*, 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770, 775 (1953); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598, 619 (1932); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303, 308 (1928); *Thompson v. Washington*, 162 U.S.App.D.C. 39, 46, 497 F.2d 626, 633 (1973).

75. *Supra* note 74.

76. 38 U.S.C. § 211(a) (1970), providing:
[T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans . . . shall be final and conclusive and no other official or any other court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

raise serious question as to the constitutionality of the finality provision itself.[77] Consequently, the Court looked to see whether Congress intended an interpretation of such dubious validity. Finding no " 'clear and convincing' evidence of congressional intent [as is] required by this Court before a statute will be construed to restrict access to judicial review" of constitutional questions,[78] the Court construed the statute to permit judicial inquiry into its consonance with the Constitution.[79]

In our case, Ralpho claims not that the Micronesian Claims Act is unconstitutional, but that the Commission's action under it denied him due process of law. This difference is urged by the Commission as a distinction.[80] But if legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitutionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well. Not only is it daring to suggest that Congress, though subject to the checks and balances of the Constitution, may create a subordinate body free from those constraints; it also beggars the imagination to suggest that judicial review might be less crucial to assuring the integrity of administrative action than it is to make certain that Congress will operate within its proper sphere.[81] If the courts are disabled from requiring administrative officials to act constitutionally, it is difficult to see who would perform that function. We say that a statute purporting to foreclose judicial redress of constitutional violations allegedly perpetrated by an administrative agency must be construed in accordance with the standards articulated in *Johnson v. Robison.*[82]

**77.** 415 U.S. at 366, 94 S.Ct. at 1165, 39 L.Ed.2d at 397, citing *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033, 1058 (1936) (Brandeis, J., concurring), *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850); *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). Two Justices have recently asserted point-blank that some sort of judicial review of agency action is a requisite of due process. *Ortwein v. Schwab*, 410 U.S. 656, 666, 93 S.Ct. 1172, 1177–1178, 35 L.Ed.2d 572, 579–580 (1973) (Marshall, J., dissenting); *id.* at 662, 93 S.Ct. at 1176, 35 L.Ed.2d at 577–578 (Douglas, J., dissenting).

**78.** 415 U.S. at 373–374, 94 S.Ct. at 1169, 39 L.Ed.2d at 402, citing *Abbott Laboratories v. Gardner, supra* note 63, 387 U.S. at 141, 87 S.Ct. at 1511, 18 L.Ed.2d at 687.

**79.** 415 U.S. at 373–374, 94 S.Ct. at 1169, 39 L.Ed.2d at 402.

**80.** Brief for Appellee at 16 n. 8.

**81.** The Senate, after all, is accountable to the populace at least every six years. U.S.Const. art. 1, § 3. *Cf. Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv.L.Rev. 1362, 1399 (1953). The Micronesian Claims Commissioners, appointed without the advice and consent of the Senate, are not, and without passing on the point of their tenure we note that, once appointed, many government officials—including members of at least one other claims commission—are accountable to no one for anything other than gross misconduct. *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).

**82.** *Supra* note 74. See *Gonzalez v. Freeman*, 118 U.S.App.D.C. 180, 185, 334 F.2d 570, 575 (1964):

Action challenged as a denial of due process—whether substantive in the sense of being arbitrary or by capricious classification, or procedural in the sense of being denied minimum safeguards—could be immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect.

*Cf. Lawrence Typographical Union v. McCulloch*, 121 U.S.App.D.C. 269, 349 F.2d 704 (1965); *Fay v. Douds*, 172 F.2d 720 (2d Cir. 1949). See also Van Alstyne, *A Critical Guide to Ex Parte McCardle*, 15 Ariz.L.Rev. 229, 268 (1975) (due process requires "at least one fair hearing in a judicial setting which, in light of the claim asserted, conforms to the Supreme Court's stated requirements of procedural due process"); Goodpaster, *The Constitution and Fundamental Rights*, 15 Ariz.L.Rev. 479, 482 (1975); Hart, *supra* note 81, 66 Harv.L.Rev. at 1394. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), is not to the contrary. See *id.* at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 537; *Hazelwood Chronic & Convalescent Hosp. v. Weinberger*, 543 F.2d 703, 706–707 (9th Cir. 1976) and cases cited therein. Indeed, the Supreme Court's recent interpretation of *Salfi* supports our decision here and reaffirms its adherence to the path taken in *Johnson v. Robison, supra* note 74:

We must, then, ascertain whether Congress intended the finality provision of the Micronesian Claims Act to cut off judicial review of constitutional claims. A reading of the legislative history of the Act discloses that if Congress took such a drastic step, it did so with marked silence as to its purpose. The first several bills introduced to implement the 1969 Japanese-American agreement to compensate the Micronesians dealt only with presecure claims. These bills tracked previous foreign-claims legislation,[83] in most particulars, but contained no language restricting review.[84] Two later versions appended to the presecure-claims provisions a second title empowering the Commission to settle and pay post-secure claims arising up to July 1, 1951. That title contained a proviso that "any such settlements . . . and any such payments . . . under the authority of *this title*" shall be final.[85] Only in the very last version of the bill was that language, still appearing in Title II, extended to cover

Title I presecure claims.[86] The extension was mentioned only once in several days of hearings;[87] it was recited but not explained in the House committee report;[88] and it was never mentioned during the floor debates.[89]

The only expressions that might suggest a legislative preference for administrative finality were those directed to a fear that the Commission might create posh sinecures by drawing out its work *in perpetuum*.[90] This was addressed, however, by another provision of the statute instructing the Commission to wind up its affairs within three years.[91] We will not assume that Congress courted a constitutional confrontation merely to facilitate Commission adherence to its timetable, which is, as we note elsewhere, directory in any event.[92] Our position is the more solidly buttressed by clear evidence of congressional concern for the due process rights of claimants under the Act.[93] Consistently with our duty

Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of those questions. . . . [A] decision denying . . . jurisdiction in *Salfi* or [*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)] would effectively have closed the Federal forum to the adjudication of colorable constitutional claims. Thus those cases merely adhered to the well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the "extraordinary" step of foreclosing jurisdiction unless Congress' intent to do so is manifested by "clear and convincing" evidence. [*Salfi*] [422 U.S.] at 762 [95 S.Ct. 2457]; *Johnson v. Robison*, 415 U.S. 361, 366–67, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).
*Califano v. Sanders, supra* note 53, 430 U.S. at 109, 97 S.Ct. at 986, 51 L.Ed.2d at 201–202.

83. Compare 50 U.S.C.App. §§ 2018–2020(b) (Supp. II 1972) with 22 U.S.C. §§ 1622–1623 (1970).

84. See *1970 House Hearings, supra* note 15, at 5–9.

85. See *1970 House Hearings, supra* note 15, at 113; *1971 House Hearings, supra* note 15, at 4.

86. H.R.J.Res. 617, 92d Cong., 1st Sess. (1970), enacted as Pub.L. No. 92–39, 85 Stat. 92, 96 (1971).

87. The entire discussion is as follows:
MR. FRASER [Chairman of the Subcommittee]: You also suggested another change. Is this just a technical change on page 5?
MR. McGUIRE [General Counsel, Foreign Claims Settlement Commission]: Yes.
MR. FRASER: That the claims are finally disposed of?
MR. McGUIRE: Yes.
MR. GARLOCK [Chairman, Foreign Claims Settlement Commission]: That has been in the other programs, too.
*1971 House Hearings, supra* note 15, at 60.

88. H.R.Rep.No. 92–226, 92d Cong., 1st Sess. 9 (1971) (on H.R.J.Res. 617); S.Rep.No. 92–76, 92d Cong., 1st Sess. 7 (1971), on the sister bill S.860, is no more enlightening.

89. See 117 Cong.Rec. 18973–18989 (1971).

90. See, *e. g.*, 117 Cong.Rec. 18978 (1971) (remarks of Representatives Hays and Gross); *id.* at 18980 (remarks of Representative Hays).

91. 50 U.S.C.App. § 2019b(e) (Supp. II 1972).

92. See Part III *infra*.

93. H.R.Rep.No. 92–226, 92d Cong., 1st Sess. 8 (1971). This apparent concern is perhaps further illuminated by the statutory directions to adhere to Trust Territory and international law, delineated in Part II–B, *infra*, the import of which we will not assume that Congress was unaware.

to avoid a reading of the statute that brings it into potential conflict with the Constitution,[94] we hold that challenges of constitutional stature impugning action by the Micronesian Claims Commission are cognizable in the federal courts.

## B. *Reviewability for Alleged Nonconstitutional Error*

The Micronesian Claims Act provides that the Commission "shall have authority to . . . adjudicate, and render final decisions, in accordance with the laws of the Trust Territory of the Pacific Islands and international law."[95] Since the Code of the Trust Territory,[96] promulgated by the Territory's American-appointed High Commissioner, specifically guarantees to its inhabitants the protections of due process, and since fair procedure in the administration of justice is equally important in the contemplation of international law[97]—which is a part of our law[98]—Ralpho urges that the Commission's action in this case contravenes the Act as well as the Constitution. Although the fate of this contention might well match that of Ralpho's constitutional

claim, the duty of a federal court is to rest its decision on nonconstitutional rather than constitutional grounds if dispositive of the litigation.[99] Thus we are obliged to consider the extent to which alleged Commission errors of nonconstitutional magnitude may be redressed "in the teeth of"[100] the finality language of Section 2020.

 Administrative agencies like the Micronesian Claims Commission derive their powers from and are bounded by statute. As such, they are subjected to the many commands, explicit and otherwise, recumbent in the legislation of which they are creatures. That Congress has imposed strictures does not, of course, prevent it from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated.[101] Yet courts have assumed it less likely that Congress intended to prohibit review of a claim that the activities of an agency are facially invalid than of "the numerous discretionary, factual, and mixed law-fact determinations"[102] normally underlying an agency's decisionmaking process.[103] This assumption reflects not

---

**94.** See cases cited note 74 *supra.* We are mindful of the limited ambit of this canon of construction. See *Swain v. Pressley,* 430 U.S. 372, 378–379 n. 11, 97 S.Ct. 1224, 1228 n. 11, 51 L.Ed.2d 411, 418–419 n. 11 (1977); H. Friendly, Benchmarks 210–212 (1967); Wellington, *Machinists v. Street: Statutory Interpretation and the Avoidance of Constitutional Issues,* 1961 Sup.Ct.Rev. 49, 67–70, 72. Nonetheless, we find the doubt sufficiently strong in this case to merit its use, and do no violence to the statutory scheme by our construction. *Cf. Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206, 210–211 (1927).

**95.** 50 U.S.C.App. § 2019c(a) (Supp. II 1972).

**96.** See 1 M. Whiteman, Digest of International Law § 41 at 798 (1963).

**97.** See Restatement (Second) of Foreign Relations Law of the United States § 181(d) (1965); 8 M. Whiteman, *supra* note 96, at 708, 734.

**98.** *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937–938, 11 L.Ed.2d 804, 820–821 (1964), and *id.* at 451–453, 84 S.Ct. at 952–953, 11 L.Ed.2d at 836–837 (White, J., dissenting); *Skiriotes v. Florida,* 313 U.S. 69, 73, 61 S.Ct. 924, 927, 85 L.Ed. 1193, 1198 (1941); *Paquete Habana,* 175 U.S. 677, 700, 20

S.Ct. 290, 299, 44 L.Ed. 320, 328–329 (1900); *District of Columbia v. International Distrib. Corp.,* 118 U.S.App.D.C. 71, 74 n. 4, 331 F.2d 817, 820 n. 4 (1964).

**99.** See generally *Ashwander v. TVA, supra* note 73, 297 U.S. at 345–348, 56 S.Ct. at 482–483, 80 L.Ed. at 710–712 (Brandeis, J., concurring).

**100.** *Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co., supra* note 60, 415 F.2d at 413 n. 20.

**101.** "All constitutional questions aside, it is for Congress to determine how the rights which it creates will be enforced." *Switchmen's Union v. National Mediation Bd., supra* note 63, 320 U.S. at 301, 64 S.Ct. at 97, 88 L.Ed. at 64. *Cf. Estep v. United States,* 327 U.S. 114, 120, 66 S.Ct. 423, 429, 90 L.Ed. 567, 572 (1946).

**102.** *Ostereich v. Selective Serv. Sys. Local Bd. No. 11, supra* note 60, 393 U.S. at 240, 89 S.Ct. at 418, 21 L.Ed.2d at 407–408 (Harlan, J., concurring).

**103.** See 4 K. Davis, Administrative Law § 28.21 at 113 (1958); *id.* at 993–994 (1970 Supp.) (pre-

only reluctance to license "free-wheeling agencies meting out their own brand of justice," [104] but also a nice appreciation, presumably shared by Congress, that courts of law possess peculiar expertise in statutory interpretation.[105] So judges have generally looked past the language of finality provisions to see how far Congress desired to muzzle the courts and unleash the agency,[106] and will normally disregard "basically lawless" [107] agency action only when clearly instructed to do so.[108]

Two lines of cases, interpreting two different preclusion statutes, illustrate this judicial disinclination to infer that Congress wished to insulate plain statutory violations from review. One concerns Section 9 of the National Labor Relations Act,[109] which renders unreviewable except in the context of unfair labor practice proceedings administrative determinations that a unit is "appropriate" for collective bargaining purposes.[110] In *Leedom v. Kyne* [111] and *Boire v. Greyhound Corporation*,[112] a narrow exception to this general rule of unreviewability was described. *Kyne* held that where the National Labor Relations Board had certified a unit as appropriate in direct contravention of a "clear and mandatory" [113] statutory provision,[114] review of the certification was available.[115] *Boire* explained that the *Kyne* exception was limited to actions "to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in

sumption of reviewability is stronger and steadier with respect to issues of constitutionality, statutory authority and fair procedure); *Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non-Contract Employees*, 380 U.S. 650, 669, 85 S.Ct. 1192, 1202, 14 L.Ed.2d 133, 146 (1965). *Cf. Municipal Light Bds. v. FPC*, 146 U.S.App.D.C. 294, 305, 450 F.2d 1341, 1352 (1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (exception to general rule of unreviewability where action is devoid of statutory authority or defies "clear and mandatory" statutory command); *Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973) (same). See also *Fleming v. Moberly Milk Prods. Co., supra* note 57, 82 U.S.App. D.C. at 22, 160 F.2d at 265; *Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975). Another recent example of this presumption may be found in *Briscoe v. Levi*, 175 U.S.App.D.C. 297, 535 F.2d 1259, *cert. granted*, 429 U.S. 997, 97 S.Ct. 522, 50 L.Ed.2d 607 (1976).

104. *Oestereich v. Selective Serv. Sys. Local Bd. No. 11, supra* note 60, 393 U.S. at 237, 89 S.Ct. at 416, 21 L.Ed.2d at 405–406.

105. See *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192, 199 (1970); *Hardin v. Kentucky Utils. Co.*, 390 U.S. 1, 14, 88 S.Ct. 651, 658–659, 19 L.Ed.2d 787, 797 (1968) (Harlan, J., dissenting); *Social Security Bd. v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718, 727 (1946); 4 K. Davis Administrative Law § 28.21 at 113 (1958).

106. See, in addition to cases discussed in text *infra*, *Harmon v. Brucker*, 355 U.S. 579, 581–582, 78 S.Ct. 433, 434–435, 2 L.Ed.2d 503, 505–506 (1958); *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51–52, 75 S.Ct. 591, 594, 99 L.Ed. 868, 873–874 (1955).

107. *Oestereich v. Selective Serv. Sys. Local Bd. No. 11, supra* note 60, 393 U.S. at 237, 89 S.Ct. at 416, 21 L.Ed.2d at 406.

108. See, *e. g.*, *Leedom v. Kyne*, 358 U.S. 184, 190, 79 S.Ct. 180, 184–185, 3 L.Ed.2d 210, 215 (1958); *Harmon v. Brucker, supra* note 106, 355 U.S. at 581–582, 78 S.Ct. at 434–435, 2 L.Ed.2d at 505–506. *Cf. Barlow v. Collins, supra* note 105, 397 U.S. at 166–167, 90 S.Ct. at 837–838, 25 L.Ed.2d at 199–200; *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 156–157, 90 S.Ct. 827, 831–832, 25 L.Ed.2d 184, 190 (1970).

109. 29 U.S.C. § 159 (1970).

110. *American Fed'n of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940).

111. *Supra* note 108. See also *McCulloch v. Sociedad Nacional de Marineros*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963).

112. 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

113. 358 U.S. at 188, 79 S.Ct. at 183–184, 3 L.Ed.2d at 214.

114. Section 9(b)(1) of the National Labor Relations Act, 29 U.S.C. § 159(b)(1) (1970), prohibited the Board from finding "appropriate" for collective bargaining a unit containing both professional and nonprofessional employees unless it secured approval by a majority of the professionals involved.

115. 358 U.S. at 189, 79 S.Ct. at 184, 3 L.Ed.2d at 214–215.

the Act," [116] and did not permit general review of appropriateness findings. Since the defect alleged in *Boire* was "essentially a factual issue, unlike the situation in *Kyne*, which depended solely upon construction of the statute," [117] it fell within the congressional proscription on judicial scrutiny. [118]

A similar line has been drawn in cases construing the statute forbidding preinduction review of selective service classifications. [119] When, for instance, a divinity student was reclassified and ordered to report for induction in the face of a statute specifically exempting divinity students, the Supreme Court refused to allow the preclusion statute to do violence to the congressional mandate to the agency. [120] Challenges to dispositions of conscientious-objector applications, on the other hand, "inescapably [involve] a determination of fact and an exercise of judgment," [121] and are not resolvable "on the basis of objectivity established and conceded" facts. [122] Such dispositions have been held unreviewable on the basis of the same preclusion statute [123] so long as the Board has "used its discretion and judgment in determining facts and arriving at a classification." [124]

In neither of these instances, which are by no means unique, was the demarcation of reviewability set by the Court expressly adumbrated by Congress. Rather, Congress had expressed an unqualified intent to shut off review, to which exception was made on grounds that the legislature would not be deemed to have barred judicial comparison of agency action with plain statutory commands unless such a ban was clearly articulated. That is not to say that the legislature must, to ensure preclusion, spell out the boundaries of its intention with excruciating particularity; most provisions for review of agency action contain *some* limitation on judicial examination. [125] It

**116.** 376 U.S. at 480, 84 S.Ct. at 898, 11 L.Ed.2d at 854, quoting *Leedom v. Kyne, supra* note 108, 358 U.S. at 188, 79 S.Ct. at 183–184, 3 L.Ed.2d at 214. See also *Brotherhood of Ry. & S.S. Clerks v. Association for the Benefit of Non-Contract Employees, supra* note 103; K. Davis, Administrative Law § 28.05 at 943 (1970 Supp.).

**117.** 376 U.S. at 481, 84 S.Ct. at 899, 11 L.Ed.2d at 855. Like *Kyne, supra* note 108, an appropriateness question was involved, but in *Boire* the alleged error lay in the Board's determination that certain employees of another company were "joint employees" to Greyhound. 376 U.S. at 475, 84 S.Ct. at 899, 11 L.Ed.2d at 851.

**118.** *Boire v. Greyhound Corp., supra* note 112, 376 U.S. at 480, 84 S.Ct. at 898, 11 L.Ed.2d at 854.

**119.** Compare *Breen v. Selective Serv. Bd.*, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970), and *Oestereich v. Selective Serv. Sys. Local Bd. No. 11, supra* note 60, with *Fein v. Selective Serv. Sys.*, 405 U.S. 365, 92 S.Ct. 1062, 31 L.Ed.2d 298 (1972); *Clark v. Gabriel*, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), and *Boyd v. Clark*, 287 F.Supp. 561 (S.D.N.Y.1968), aff'd, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

**120.** *Oestereich v. Selective Serv. Sys. Local Bd. No. 11, supra* note 60, 393 U.S. at 238, 89 S.Ct. at 416–417, 21 L.Ed.2d at 406. Cf. *Breen v. Selective Serv. Bd., supra* note 120, 396 U.S. at 465–466, 90 S.Ct. at 664–665, 24 L.Ed.2d at 659–660.

**121.** *Clark v. Gabriel, supra* note 119, 393 U.S. at 258–259, 89 S.Ct. at 426, 21 L.Ed.2d at 421, quoted in *Fein v. Selective Serv. Sys., supra* note 119, 405 U.S. 373–374, 92 S.Ct. at 1068–1069, 31 L.Ed.2d at 305–306.

**122.** *Fein v. Selective Serv. Sys., supra* note 119, 405 U.S. at 375, 92 S.Ct. at 1069–1070, 31 L.Ed.2d at 307.

**123.** Section 10(b)(3) of the Military Selective Service Act of 1967, 50 U.S.C.App. § 460(b)(3) (1970) ("[n]o judicial review shall be made of the classification or processing of any registrant . . . except as a defense to a criminal prosecution").

**124.** *Fein v. Selective Serv. Sys., supra* note 119, 405 U.S. at 375, 92 S.Ct. at 1069–1070, 31 L.Ed.2d at 307.

**125.** As noted in text and notes at note 55 *supra*, the Administrative Procedure Act provides for all but plenary review unless otherwise indicated; thus statutes—and judge-made glosses upon them—that permit review only to ascertain whether the agency is supported by substantial evidence, or has acted non-arbitrarily and within its discretion, are statutes of the sort described in 5 U.S.C. § 701(a)(1) (1970). See 4 K. Davis, Administrative Law § 28.08 at 33–34 (1958); Note, *supra*, note 58, 1976 Duke L.J. at 432 n. 4.

merely supposes that Congress would have imposed such a drastic restraint on judicial inquiry and given such free rein to the administrator only after deliberation that made its intentions plain.

Judging Section 2020 of the Micronesian Claims Act by these lights, we find no such reflection and no indication of such a purpose.[126] Absent more, we would be inclined to find in Section 2020 an implied exception of the sort found in *Kyne* and other cases.[127] The Commission, however, seeks support for its position of absolute unreviewability not in the declarations of Congress, but in our decisions interpreting other laws providing for satisfaction of war claims. In *DeVegvar v. Gillilland*[128] and *American and European Agencies v. Gillilland*[129] this court held that awards of the Foreign Claims Settlement Commission were rendered unreviewable even for readily apparent statutory violations.[130] For this conclusion the court relied upon legislative history leaving no doubt that "[t]hose [finality] provisions mean precisely what they say"[131] in specifying that there shall be no judicial review. Substantial congressional attention had been directed to the issue of reviewability,[132] and both proponents and opponents had acknowledged that the "doors

of the courts" were closed by the statute,[133] leaving the Commission as the "court of last resort."[134] Indeed, an amendment to strike the finality clause as inconsistent with both the spirit and the letter of the then-new Administrative Procedure Act had been offered and defeated.[135]

 Without drawing into question our decisions in *DeVegvar* and *American and European Agencies,* we point out that the parameters within which the Foreign Claims Settlement Act was necessarily to be construed are far different from those facing interpretation of the Micronesian Claims Act. Here we are confronted with no clear congressional directive to withhold consideration of Ralpho's contention that the Commission disregarded the plain letter of the law; in fact, we have no evidence at all of the scope that Congress contemplated for the finality provision.[136] Consequently, we do not regard *DeVegvar* and *American and European Agencies* as controlling here. Instead, guided by the Supreme Court's handling of similar statutory schemes,[137] we hold that Section 2020 of the Act, though it prohibits review in the usual case, does not forestall judicial cognizance of plaints that the Commission has disregarded unambigu-

---

**126.** See text and notes *supra* at notes 83–89.

**127.** See text and notes *supra* at notes 111–124.

**128.** 97 U.S.App.D.C. 126, 228 F.2d 640 (1955), *cert. denied,* 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956).

**129.** 101 U.S.App.D.C. 104, 247 F.2d 95, *cert. denied,* 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957).

**130.** This holding was predicated upon a finality provision reading as follows:

> The action of the Commission in allowing or denying any claim under this Act shall be final and conclusive on all questions of law and fact and not subject to review by the Secretary of State or any other official, department, agency or establishment of the United States or by any court by mandamus or otherwise.

22 U.S.C. § 1623(h) (1970).

**131.** 95 Cong.Rec. 8840 (1949) (remarks of Representative Ribicoff).

**132.** See *id.* at 8840–8854.

**133.** *Id.* at 8854 (exchange between Representative Jensen and Representative Ribicoff).

**134.** *Id.* at 8845 (exchange between Representatives Dondero and Voys). Indeed, the bill's sponsors were of the opinion that the Constitution forbade judicial review of a claims question. 95 Cong.Rec. at 8840, 8845, 8854 (1949), relying upon *Z & F Assets Realization Corp. v. Hull,* 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941). They also assumed that war claimants had no "constitutional guaranty" of due process, in contrast to those who dealt with the Government in other connections. 95 Cong. Rec. at 8854 (1949) (remarks of Representative Ribicoff).

**135.** *Id.* at 8853 (introduced by and accompanied by remarks of Representative Keating).

**136.** See text and notes *supra* at notes 83–89.

**137.** See text and notes at notes 111–124 *supra.*

ous statutory directives or, as detailed above, constitutional commands.[138]

 This holding is consistent not only with logic and judicial precedent, but also with the Nation's commitment to the Micronesian people and to the United Nations. In the Trusteeship Agreement, whence Congress' power in the Trust Territory flows, we bound ourselves to "encourage respect for human rights and fundamental freedoms for all" in our dealings in Micronesia.[139] Whether or not that pledge amounts to a legally enforceable guaranty of substantive rights to the inhabitants of the Trust Territory,[140] it must be taken as an expression of moral principle not lightly to be disregarded. Were Congress effectively to frustrate Ralpho's ability to obtain judicial redress for an allegedly serious violation of his "fundamental freedoms," it would to that extent call into question the seriousness of our devotion to that principle. This we will not do without a clearer mandate from Congress.[141]

## III. EFFECT OF STATUTORY WIND–UP PROVISION

Since we find jurisdiction in the District Court to review actions of the Micronesian Claims Commission allegedly in contravention of either the Constitution or plain statutory imperatives, we must remand this case to afford a further opportunity to exercise that jurisdiction. To ease the District Court's considerable task on remand, we now proceed to address several issues that are bound to arise therein. In this part of our opinion we will consider the effect of the three-year windup provision [142] on further prosecution of Ralpho's claim. In Part IV we will set forth the legal parameters within which Ralpho's due process contention must be assessed.

Section 2019b(e) of the Micronesian Claims Act provides that the Commission "shall wind up its affairs as expeditiously as possible, and in any event not later than three years after the expiration of the time for filing claims under this Act." [143] That filing deadline was October 15, 1973,[144] and so the windup date has passed during the pendency of this litigation. The Commission now insists that this statutory specification is mandatory rather than directory, and that it has divested the Commission of any legal power even to redress its own malfeasance.[145] It perceives the statute as having, like Lachesis, measured out the duration of its obligations of procedural fairness and, inflexible as Atropos, cut it off at October 15, 1976.

This position unduly exalts the importance of the windup provision in derogation of the Act's overriding goals. Most congressional mentions of Section 2019b(e) it-

138. See Part II–A *supra.*

139. Charter of United Nations, June 26, 1945, ch. XII, art. 76(c), 59 Stat. 1049, incorporated by reference in Trusteeship Agreement, *supra* note 9, 61 Stat. 3302–3303.

140. See *Saipan v. Department of Interior, supra* note 54, 502 F.2d at 97. But see *Pauling v. McElroy,* 164 F.Supp. 390, 393 (D.D.C.1958), aff'd, 107 U.S.App.D.C. 372, 278 F.2d 252, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960). But cf. *Diggs v. Richardson,* 180 U.S. App.D.C. 376, 555 F.2d 848 (1976).

141. See *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 54 S.Ct. 361, 78 L.Ed. 695 (1934). *Cf. Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697, 703 (1968). See also *Diggs v. Schultz,* 152 U.S.App.D.C. 313, 318, 470 F.2d 461, 466 (1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897,

36 L.Ed.2d 390 (1973); Note, 13 Colum. J. Transnat'l L. 155, 159–160 (1974).

142. 50 U.S.C.App. § 2019b(e) (Supp. II 1972). This question was not initially addressed by the parties, but the court, *sua sponte,* called for supplemental memoranda on this point. The Government's response revealed that the Commission had completed its adjudicatory process and that at that time the only official action it anticipated taking was preparation and submission of its final report to Congress. Affidavit of Wayland D. McClellan, Oct. 22, 1976.

143. *Id.*

144. As provided in the Commission's Regulation § 591.2, 1973 FCSC Ann.Rep., *supra* note 28, at 60.

145. Supplemental Memorandum of Appellee at 4–5.

self stemmed from fear that the bureaucracy created by the Act might unduly prolong its life at public expense.[146] These apprehensions elicited assurances from supporters of the Act that Section 2019b(e) protected against such waste.[147] This solicitude for the federal fisc, however, does not eclipse the purpose of the Act—swift justice for long-standing Micronesian claims. Nor should it obscure the fundamental motivations for the congressional action—fulfillment of international commitments and elimination of disgruntlement in the Trust Territory.[148] Nowhere have we encountered the slightest indication that justice was to be sacrificed on the altar of speed. Had the Commission's activities been concluded without incident, no conflict between promptitude and justice would have arisen. But as things are, we seriously

doubt that the will of Congress would be served by letting haste limit and even obliterate fairness.

 In determining the effect of the windup provision, we must cleave as nearly as we can to the congressional design.[149] That design, as evidenced by "the mischief to be remedied" as well as "contemporaneous discussion," [150] convinces us that justice to the Micronesians is not to be renounced simply to avoid even a brief additional lease on life for the Commission. Statutes that, for guidance of a governmental official's discharge of duties, propose "to secure order, system, and dispatch in proceedings" are usually construed as directory, whether or not worded in the imperative,[151] especially when the alternative is harshness or absurdity.[152] Though phrased in "the lan-

**146.** See 117 Cong.Rec. at 18976–18980, 18988 (1971).

**147.** *E. g.,* 117 Cong.Rec. 18980 (1971) (remarks of Representative Fraser) ("[t]he commission that is created will last only for 3 years, and then it will go out of business"). *Cf. id.* at 18977–18978 (remarks of Representative Meeds).

**148.** See, *e. g.,* S.Rep.No. 92–76, *supra* note 88, at 15, 28; H.R.Rep.No. 92–226, *supra* note 88, at 1; 117 Cong.Rec. 18973 (1971) (remarks of Representative Matsunaga), *id.* at 18975 (remarks of Representative Fraser, the subcommittee chairman), *id.* at 18976 (remarks of Representative Frelinghuysen), *id.* at 18977 (remarks of Representative Mink), *id.* at 18979 (remarks of Representative Rhodes). In addition, the hearings on the bill that became the Act and predecessor versions are shot through with indications from foreign policy personnel that American prestige was to some extent inextricably linked with its treatment of the Micronesian claims, and that the Micronesians themselves were dissatisfied with American efforts in that direction. See generally *1971 House Hearings; 1970 House Hearings,* both *supra* note 15.

**149.** See, *e.g.,* Buckley v. Valeo, 171 U.S.App. D.C. 172, 244 n.191, 519 F.2d 821, 893 n.191 (1975), *aff'd in part and rev'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Ballou v. Kemp,* 68 App.D.C. 7, 10, 92 F.2d 556, 559 (1937); *United States v. Reeb,* 433 F.2d 381, 383 (9th Cir. 1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971); *United States v. St. Regis Paper Co.,* 355 F.2d 688, 692 (2d Cir. 1966); *Kraft v. Board of Educ.,* 247 F.Supp. 21, 25 (D.D.C.1965), *cert. denied,* 386

U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 106 (1966). *Cf.* 1A C. Sands, Statutory Interpretation § 25.03 at 298–300 (4th ed. 1972); *Escoe v. Zerbst,* 295 U.S. 490, 494, 55 S.Ct. 818, 820, 79 L.Ed. 1566, 1569 (1935); *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 355, 408 F.2d 154, 158 (1968).

**150.** *Duparquet, Huot & Moneuse Co. v. Evans,* 297 U.S. 216, 221, 56 S.Ct. 412, 414–415, 80 L.Ed. 591, 594 (1936). *Cf. Natural Resources Defense Council v. TVA,* 459 F.2d 255, 257 (2d Cir. 1972).

**151.** *French v. Edwards,* 80 U.S. (13 Wall.) 506, 511, 20 L.Ed. 702, 703 (1872). See *United States v. Morris,* 252 F.2d 643, 649 (5th Cir. 1958); *Triangle Candy Co. v. United States,* 144 F.2d 195, 198 (9th Cir. 1944); *Diamond Match Co. v. United States,* 181 F.Supp. 952, 958–959 (Cust.Ct.1960).

**152.** *Cf. Ballou v. Kemp, supra* note 149, 68 App.D.C. at 9, 92 F.2d at 558; *Holbrook v. United States,* 284 F.2d 747, 752 (9th Cir. 1960). In *United States v. Morris, supra* note 151, a statute setting minimum wages for alien farm workers specified that an international disposition of any complaint alleging substandard wages "shall be completed not later that ten days" after receipt of the complaint. The employer accused of paying substandard wages contended that since the disposition of the complaint against him had taken 23 days, it was a nullity. This court rejected on the grounds it was unreasonable to assume that Congress intended to establish a procedure "that would fail altogether for any case, no matter how serious or aggravated, which was

guage of command," [153] the windup provision would, if construed as mandatory, allow the Commission to walk away from what Ralpho asserts was unconstitutionally shoddy treatment. We prefer a construction that bestows the benefits of the Act on those for whom it was chiefly intended, [154] and hold that, in the event the District Court should find merit in Ralpho's allegations, it must direct the Commission to give such relief as is appropriate. [155]

## IV. PARAMETERS OF RALPHO'S DUE PROCESS CLAIM

██ Ralpho's basic claim, from which we have been so long distracted by questions *in limine,* is that the value study upon which the Commission ostensibly relied in assessing his damages was not made available in time to enable him to challenge it. An opportunity to meet and rebut evidence utilized by an administrative agency has long been regarded as a primary requisite

of due process. [156] The more difficult question has been whether due process is implicated in a given case. To this effect we are directed to our 20-year-old decision in *American and European Agencies,* [157] on facts nearly identical to those here. A claimant was refused access to a staff memorandum to which the agency resorted in determining the value of his claim. [158] After construing the finality provision there in question, [159] the court assumed *arguendo* that review of constitutional questions was permissible and addressed the merits of the claimant's due process argument. The court acknowledged that if the claim for monetary relief amounted to the assertion of a "right," the refusal to allow inspection of evidence crucial to the administrative decision would have been constitutionally impermissible, [160] and with so much of its logic we agree. [161] The court went on to find, however, that in its quest for war claims compensation the claimant sought a

---

incapable of resolution within ten days." 252 F.2d at 649.

**153.** *Escoe v. Zerbst, supra* note 149, 295 U.S. at 493, 55 S.Ct. at 819–820, 79 L.Ed. at 1569.

**154.** See *Thompson v. Clifford, supra* note 149, 132 U.S.App.D.C. at 355–356, 408 F.2d at 158–159; *Holbrook v. United States, supra* note 152, 284 F.2d at 752–754. See also the many cases in which, conversely, provisions exacting some requirement of a government official were construed as mandatory against him when to make them directory would result in serious impairment of the private interests to be protected, *e. g., Escoe v. Zerbst, supra* note 149; *French v. Edwards, supra* note 151; for in such a case, "the power is conferred for their benefit, not his." *Mason v. Fearson,* 50 U.S. (9 How.) 248, 259, 13 L.Ed. 125, 130 (1850).

**155.** *Cf. Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n,* 158 U.S.App.D.C. 7, 49, 485 F.2d 786, 828 (1973), *cert. denied* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

**156.** See cases cited *infra* notes 160–161.

**157.** *Supra* note 129.

**158.** 101 U.S.App.D.C. at 106, 247 F.2d at 97.

**159.** See notes 128–135 *supra* and accompanying text.

**160.** 101 U.S.App.D.C. at 106, 247 F.2d at 97, citing *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) and *Ohio Bell Tel. v. Public Utils. Comm'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). In *Morgan,* regulatees were never afforded an opportunity either to examine the agency's factual findings or to have notice of issues under consideration by the agency before a binding decision was issued. In *Ohio Bell,* a state utility commission issued rate regulations after taking "judicial notice" of an *ex parte* study it had made of price trends for certain properties, but did not release the study to those subject to the regulations. In both cases, reliance on extra-record factual evidence without opportunity to the parties to inspect and address was held to be a denial of due process.

**161.** See *Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 585, 188 Ct.Cl. 644 (1969):

> Because this right-to-know is so basic to fair process, the courts have often read agency regulations and procedures . . . to include comparable safeguards insuring knowledge of the relevant contentions [citations omitted].

There the Maritime Subsidy Board was held required to inform claimants of its staff's position on disputed issues of fact in order that they might offer evidence in rebuttal. *Cf. Virgin Islands Hotel Ass'n v. Virgin Islands Water & Power Auth.,* 465 F.2d 1272, 1276 (3d Cir. 1972).

privilege, not a right; and thus it did not find all the trappings of due process to obtain.[162]

■■■■ While, as a panel, we have no general license to undercut prior holdings of this circuit, we obviously cannot blindly follow prior rulings in the face of clearly contradictory doctrine later enunciated by the Supreme Court. And as we have recognized,[163] the distinction drawn 20 years ago in *American and European Agencies* between a "right" and a "privilege" has given way to a far different definition of property interests under the Fifth Amendment.[164] The import of *Goldberg v. Kelly*[165] and its progeny[166] is unmistakable: a statute that bestows an "entitlement" must do so in accordance with the dictates of the due process clause. *Goldberg* itself dealt with the right to a hearing prior to termination of welfare benefits, and the Supreme Court held that the putative beneficiary must be given a fair opportunity to be heard before he is deprived of their enjoyment.[167]

■■■■ Here there is no question but that Ralpho is entitled to something under the Micronesian Claims Act; indeed, the Commission admits this much. We think he should have been given an opportunity to meet evidence which the Commission intended to consider in making its decision. To this extent, the holding of *American and European Agencies* must be seen as a victim of the shifting stands of due process adjudication.

## V. CONCLUSION

This protracted lawsuit, like many another, could have been averted if only the administrative agency involved had shown a modicum of consideration for an individual who must deal with it. The Commission's development of valuation guidelines may well have been salutary,[168] but its refusal to let Ralpho study and address those guidelines seems merely perverse. We can discern from the record no public policy that was perceptibly furthered by the Commission's reticence,[169] and surely mystery without purpose has no place in government. In any event, we hold that the result of its apparently aimless obduracy—Ralpho's complaint that a statutory directive was disregarded, and possibly even a constitutional imperative—is subject to judicial review. So, we reverse the judgment of

---

**162.** *American & European Agencies, Inc. v. Gillilland, supra* note 129, 101 U.S.App.D.C. at 107–108, 247 F.2d at 98–99:

> The Foreign Claims Settlement Commission . . . has the duty of distributing a governmentally created fund among a class. No claimant . . . has a right to participate in any amount until the commission has made an award. In short, a benefit is being conferred, and . . . due process in these circumstances surely does not require more than an opportunity for the claimant to be heard.

**163.** *E. g., Thompson v. Washington, supra* note 74, 162 U.S.App.D.C. at 47, 497 F.2d at 634.

**164.** See generally Reich, *The New Property,* 73 Yale L.J. 733 (1964); Comment, *Entitlement, Enjoyment, and Due Process of Law,* 1974 Duke L.J. 89.

**165.** 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

**166.** *E. g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

**167.** 397 U.S. at 262 n. 8, 90 S.Ct. at 1017 n. 8, 25 L.Ed.2d at 295–296 n. 8.

**168.** *Cf. NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 777–779, 89 S.Ct. 1426, 1436, 22 L.Ed.2d 709, 721–722 (1969) (Douglas, J., dissenting); *SEC v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947); *Pressley v. FCC,* 141 U.S.App.D.C. 283, 288–289, 437 F.2d 716, 721–722 (1970); *Morales v. Schmidt,* 494 F.2d 85, 87–88 (7th Cir. en banc 1974) (Stevens, J., concurring). See also *Morton v. Ruiz,* 415 U.S. 199, 231–236, 94 S.Ct. 1055, 1072–1075, 39 L.Ed.2d 270, 291–294 (1974). See generally K. Davis, Administrative Law of the Seventies §§ 6.01, 6.13–1 at 167–169, 223–240; K. Davis Administrative Law §§ 6.13–6.15 at 278–284 (1970 Supp.); Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv.L.Rev. 921, 946–947 (1965).

**169.** This impression is substantiated by the Commission's grudging but apparently painless release of the guidelines to Ralpho two months after the hearing on his claim. See note 47 *supra* and accompanying text.

the District Court and remand the case to it for further proceedings not inconsistent with this opinion.

*So ordered.*